[Civ. No. 2975.   Third Appellate District.—May 14, 1925.]

In the Matter of the Estate of J. W. JOHNSON, Deceased.

[1] WILLS—MENTAL CAPACITY—EVIDENCE—UNNATURAL WILL.—While a person has the legal right to make an unnatural will, the fact that it is so may be considered with other evidence of mental unsoundness in determining the mental capacity of the testator.

---

1. Unnatural or unjust disposition of property as evidence of testamentary capacity, notes, 13 Ann. Cas. 1044; Ann. Cas. 1917E, 130. See, also, 28 R. C. L. 107.

[2] Id.—Contests — Burden of Proof — Indirect Evidence.—Where the probate of a will is contested on the ground that the testator was not of sound and disposing mind, the burden is upon the contestants to show the mental incapacity of the testator at the very time the will was executed, but this does not mean that his incompetency must be proved by direct evidence of his mental condition at that time—the nature of the disease with which he was afflicted, his mental condition and his acts and conduct, both before and after the execution of the will, and the terms of the will itself, may all be considered in determining whether he was of sound mind when he signed it.

(1) 40 Cyc., p. 1033, n. 14, p. 1034, n. 18, p. 1079, n. 88, 89, (2) 40 Cyc., p. 1020, n. 11, p. 1023, n. 22, 28, 29, p. 1028, n. 75, 77.

APPEAL from a judgment of the Superior Court of Sutter County. K. S. Mahon, Judge. Affirmed.

The facts are stated in the opinion of the court.

Ray Manwell and J. E. Ebert for Appellant.

Arthur Coats and W. H. Carlin for Respondent.

FINCH, P. J.—A document purporting to be the last will of the above-named decedent was duly offered for probate. Three of the heirs of decedent duly appeared and filed their opposition to the probate thereof upon the grounds that the same was not executed by the decedent and that at the time of the purported execution thereof the decedent was not of sound and disposing mind. The contest was tried by the court without a jury. The court found that at the time the instrument was executed the decedent was not of sound and disposing mind. Judgment was entered upon the findings denying probate of the purported will. From this judgment Hattie M. Sligar, one of the beneficiaries under the purported will, has appealed. The only ground urged for a reversal of the judgment is that the evidence is insufficient to support the finding to the effect that the decedent was mentally incompetent to make a will.

2. Time to which inquiry as to testamentary capacity limited, note, 18 Ann. Cas. 905.

What constitutes capacity or incapacity to make a will, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444. See, also, 28 R. C. L. 93.

The provisions of the purported will material here are as follows:

"1. I direct my executors, hereinafter named, to convert into money all real and personal property owned by me at the time of my death.

"2. I give, devise and bequeath my entire estate as follows, to-wit: To my son, Arthur Johnson, the sum of ten thousand dollars, to my daughter, Lillie Johnson, the sum of ten thousand dollars; to my son, Henry Johnson, the sum of four thousand dollars; to my grandchildren, Clara Burton and Elna Burton, children of my deceased daughter, each the sum of ten thousand dollars; to my grandchildren, Dorothy May Johnson and Laura Johnson, children of my said son, Henry Johnson, each the sum of ten thousand dollars; to my friend Hattie M. Sligar, the sum of ten thousand dollars; to my friends W. E. Tucker and A. C. McLaughlin, each the sum of two thousand dollars; and to my friend Elizabeth Conant, of Marysville, California, the sum of one thousand dollars; and all the rest, residue and remainder of my property I give, devise and bequeath to my said son, Arthur Johnson, and my said daughter, Lillie Johnson, share and share alike.

"3. In the event that my estate, after payment of my just debts, expenses of my last illness and funeral expenses, and the expenses and charges of administration of my estate, should be less than the aggregate of the above bequests then said bequests shall be reduced proportionately."

The evidence bearing upon the mental capacity of the decedent, in addition to the terms of the will itself, consists of the testimony of witnesses as follows:

M. J. Wilcoxon: "I am the warden in the Sutter County Hospital. . . . I have known the testator, J. W. Johnson all my lifetime, but was never personally acquainted with him. I . . . am one of the susbcribing witnesses to the instrument purporting to be his will. The will was executed at the hospital on the first day of July, 1922. . . . At that time J. W. Johnson, testator, was of sound and disposing mind. . . . Mr. Johnson arrived at the Sutter County Hospital on June 29th, 1922, in the evening. He was quite sick and I think he was delirious the first day. On the next day . . . he remained in the hospital in bed. The document . . . was by him signed on the first day of July, 1922,

about four o'clock in the afternoon. Mr. Johnson . . . remained there until July 5th, 1922, when he left. He again returned to the hospital on July 12th, 1922, and remained until July 17th, 1922, when he again left. During this last time from July 12th to July 17th, I observed his condition. His mental condition was very bad. I considered him insane. . . . I don't know that I would call him insane, but he seemed to be awful delirious. He wouldn't keep any clothes on himself. He just ran around like a crazy man."

Walter L. Barrett: "I was present at the time the will was executed and the testator, who could neither read nor write, asked me to subscribe his name thereto and he made his mark in my presence, and I also subscribed his name thereto."

Mrs. Elizabeth Conant, a beneficiary under the will: "I . . . nursed him (testator) from said 30th day of June, 1922, until the 5th day of July of the same year. . . . I saw the testator when he came to the hospital on the 29th day of June. . . . Q. On the 30th day of June, what was his physical condition? A. Rather bad. . . . He seemed to have hemorrhages of the bladder and he had a high temperature at the time, . . . on the evening of the 30th. . . . The first thing he asked me was to call Mr. McLaughlin and I said, 'Don't you think you better wait until morning? It is rather late.' . . . He said well, that would be all right, and he was restless more or less all night. . . . The first thing in the morning he asked me if I would call Mr. McLaughlin and I told him I would as soon as breakfast was over, and after breakfast he asked me again if I would call Mr. McLaughlin. He said he was very anxious to see him because he wanted him to fix some papers and so I called Mr. McLaughlin."

Allen E. Gray: "I am a physician and surgeon. I have known Mr. J. W. Johnson by sight for a long time, but had never known him intimately, except that I had talked to him and examined him once previous to the 29th day of June, 1922. I attended the testator . . . from the time he came to the Sutter County Hospital until the 5th of July. . . . At the time he was brought in the man was a sick man. He had a running fever. He had no hallucinations or delirium or any signs of insanity at the time except he

was suffering with pain at the time. I would not say he was of unsound mind. I was not treating him for that at all and did not pay much attention to his conversations that I had with him. For the first few days he was in pain and was a little delirious the first day that I saw him, the first evening. After that his condition seemed to improve. I talked with him every day that I saw him. I would say that from the 29th day of June until the 5th day of July, 1922, he was in as sound mind as any person under his physical condition that he had at that time. I did not discuss any business matters with him at all."

A. C. McLaughlin, who drafted the will and was named as a beneficiary thereunder: "I have known decedent for over thirty years. I suppose I have rendered favors to Mr. Johnson in his lifetime but not such as I would call particular favors. I was attorney for his son in a little matter that came up a number of years ago and he consulted me on various occasions, particularly at that time when he had someone arrested for taking a shot at him. I was called to the hospital on July 1st, at the request of Mr. Johnson, and was informed by Mr. Johnson that he desired to execute his will, and I was then and there informed of the terms and provisions he desired placed therein. . . . I discussed the terms and provisions with the decedent at that time, returned to my office in Yuba City and prepared the document, . . . and returned with it to the hospital where the terms and provisions thereof were thoroughly explained to the testator and it was immediately thereafter duly executed by the testator. . . . At the time of the execution of this will the said decedent was of sound and disposing mind and memory."

Charles DaKosse: "I have known J. W. Johnson personally for the last seven years. During said time I have worked for him and frequently talked with him. During the six months prior and up to the first day of July, 1922, Mr. Johnson frequently came to my home and we talked together, and during that period there were times when Mr. Johnson acted as if he was not in his right mind and at other times he would carry on a conversation fairly well."

J. H. Barr: I am a physician and surgeon. . . . I was one of the physicians who examined Mr. J. W. Johnson concerning his sanity on the 17th day of July, 1922. . . . Pos-

sibly I had known Mr. Johnson personally for about twenty-nine years in this vicinity. I frequently saw him and met him. . . . On the 17th day of July, 1922, I found that he was insane, suffering from acute mania, also from paresis, which is a form of softening of the brain, a general, gradual breaking down of the brain tissue. . . . We found Mr. Johnson suffering from paresis and as far as the period of time is concerned, that would depend altogether on the amount of lesion taking place in the brain. It may be fast, or it may be of long duration, depending on the individual himself as to how long he is in breaking down. . . . It is quite probable that it existed at that time (July 1st.), . . . because that would be very rapid. His physical condition was not bad, it was not poor as it might be. Mr. Johnson had stripped himself and I was surprised that the physical condition was as good as it was under the mental condition. . . . He was in a maudlin condition. . . . I will say that it could be this mental condition which we found . . . did not exist two or three weeks before, but it is more than likely that that trouble occurred in not a less period than two or three weeks and it gradually came up to this breaking point. That is the shortest period that I gave you and the longest period might extend over three or four years.''

Samuel Gray: ''I have known Mr. J. W. Johnson for more than forty years. . . . We very frequently talked together, on the ranch, in town and on the roads, and in different places. . . . I saw him July 2, 1922, in the Sutter County Hospital. It was in the evening, and I then considered him of unsound mind. I had with me his cousin, a Mr. Tom Hutchinson, who was here from Iowa for three or four days. . . . I introduced Mr. Hutchinson to Mr. Johnson and told him who he was and asked him if he recognized Johnnie Hutchinson, his cousin, and he said, 'Yes,' and we took chairs alongside of him. . . . Mr. Hutchinson was a grown man. . . . When we sat down, Mr. Johnson said to me, 'Where did you get that boy?' . . . I tried to introduce him again and told him who he was and I didn't seem to attract his mind, and he went on talking about something else. . . . He said, 'My head hurts like everything.' . . . He told me that he had made his will, he didn't say when, and he said he left his boys well fixed. I

said to him, 'I see by the papers that you sold your ranch' and he said, 'Yes, I sold the ranch for $120,000, and the papers are all fixed up and we are going to sign them to-morrow.' . . . I ascertained shortly afterwards the fact that he had not sold his ranch at all.''

Thurlow Dowell: "I knew Mr. J. W. Johnson prior to his death for a period of four or five years. During a period of six or seven months up to the time of his death I saw him often, probably once a week on an average, and talked with him. I usually saw him at my garage in Yuba City, and during that time some days he would be regular and some days irregular, but I don't believe that during any of said time that he was of sound mind. . . . Just before he went to the Sutter County Hospital, he gave me the names of a dozen or so men around the courthouse here that he thought were not doing their official capacity and that they should be removed from office, said that he was a deputy United States marshal and was going to have them all taken out. . . . During that period he came to my garage there one day, he was in there and took the water hose and opened up the front of his shirt and let the water run there for a period of three hours off and on, most all the time on.''

Morris Peters: "I knew Mr. J. W. Johnson for a period of approximately thirty years up to the time of his death, . . . and during all that time frequently talked with him and observed his condition. For a period of one year prior and up to the first day of July, 1922, I did not consider Mr. Johnson of sound mind. At times he would talk rational. During that time a disease came on him along about the first day of May, 1922. He would stop at my house four or five nights a week . . . and talk with me. . . . When he would be at my place talking he would talk along rationally and all at once he would cry out and was going after this fellow and that fellow, and on one occasion he stopped me on the highway . . . and run his automobile in front of me and I stopped and asked him, 'What is the matter, Billy?' . . . He said, 'I am going to arrest you, . . . run your machine out to the side of the road and go along with me.' . . . He said, 'I will let you go this time, but I want you to-morrow.' . . . He said, 'There is a fellow

I am after and I am going to get him. I am a United States marshal now.' ''

W. E. Tucker: ''I am one of the persons named as beneficiaries in the document offered for probate here. . . . I had some personal dealings with Mr. Johnson collecting some bills for him and something like that when he was in the butcher business. I have not had much dealings with him in the last four or five years. Afterwards he would meet me,, I would stop and talk and possibly pass the time of the day. There is no blood relation existing between him and me. I did not charge him for collecting bills except one large bill. There were no social relations existing between us. My family did not visit his family.''

July 17, 1922, the decedent was adjudged to be insane and committed to the state hospital at Napa, where he died five days later. The evidence does not show the value of decedent's estate, but in the petition for the probate of the alleged will the estimated value of the estate is given as ninety-five thousand dollars. The bequests aggregate seventy-nine thousand dollars. The alleged will is drafted upon the theory that the assets of the estate may be insufficient to pay the legacies in full, for it provides that in such case the ''bequests shall be reduced proportionately.'' The evidence does not show that there was any estrangement between the decedent and his children. It does not appear that any of the legatees who were strangers in blood had any claim upon the bounty of decedent and it affirmatively appears that some of them had no such claim.

Under all the circumstances it clearly appears that the will is unnatural in its provisions. [1] While a person has the legal right to make an unnatural will, the fact that it is so may be considered with other evidence of mental unsoundness in determining the mental capacity of the testator. (*Estate of Gallo,* 61 Cal. App. 163, 175 [214 Pac. 496], and cases there cited.)

[2] The burden was upon the contestants to show the mental incapacity of the testator at the very time the will was executed, but this does not mean that his incompetency must be proved by direct evidence of his mental condition at that time. The nature of the disease with which he was afflicted, his mental condition, and his acts and conduct, both before and after the execution of the will, and the

terms of the will itself may all be considered in determining whether he was of sound mind when he signed it. Intimate acquaintances testified that the testator was of unsound mind shortly before and after the day that the instrument was signed. On the day following its execution he could not be made to understand that his cousin from a distant state was visiting him and in his presence, and within a few days thereafter his mental affliction developed into pronounced and hopeless insanity. In view of all the foregoing facts and circumstances, it cannot be held that the evidence is insufficient to support the finding that the decedent was not of sound and disposing mind at the time he signed the instrument offered for probate as his will.

The judgment is affirmed.

Shields, J., *pro tem.,* and Plummer, J., concurred.

Appellant's petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 13, 1925.

All the Justices concurred.