[Civ. No. 5394. Third Appellate District.—June 12, 1935.]

In the Matter of the Estate of JULIA M. SHORT, Deceased. DIXIE PULLIAM, Executrix, etc., Respondent, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a Corporation) et al., Appellants.

Clarence N. Riggins for Appellants.

E. L. Webber and Nathan F. Coombs for Respondent.

PLUMMER, J.—This cause is before us upon an appeal by the Bank of America National Trust and Savings Corporation, a corporation, and Laura Treadway, from a judgment of the trial court refusing to admit the will of Julia M. Short to probate, and from an order denying a motion for judgment admitting the will to probate notwithstanding the verdict. The contest filed in this action was based upon three grounds: 1st. Unsoundness of mind; 2d. Undue influence on the part of Laura Treadway; and, 3d. Nonexecution of the will.

When the taking of testimony was terminated, the court granted a nonsuit as to the second and third grounds of contest, leaving for the determination of the jury before which the cause was being tried the question of the alleged unsoundness of mind of the testatrix. The defendants, also, in addition to their motion for nonsuit, moved for a directed verdict, which was denied. The jury before which the cause was tried rendered a verdict that the testatrix was of unsound mind at the time of the execution of the will. Following the rendition of the verdict, a motion for judgment notwithstanding the verdict was made by the defendants, and denied by the court.

Julia M. Short died on April 12, 1933, at the St. Helena Sanitarium, where she had been a patient for approximately four weeks. The will was executed three hours before her death, in the presence of Dr. H. W. Vollmer, medical superintendent of the sanitarium, Clarence N. Riggins, the attorney who drew the will, and Elsie Magee, a nurse. Dr. Vollmer and Mr. Riggins signed the will as witnesses. At the time of her death Mrs. Short was approximately 59 years of age. Her husband, Harry Short, had died three years previously. Mrs. Short left no children. Her father was not living, and the only relative left her surviving was a mother, Mary E. Jasper, contestant herein, and a brother, John D. Jasper. Mrs. Laura Treadway and Mrs. Short had been close friends for many years. The will left the entire estate in trust to the Bank of America National Trust and Savings Association, with directions to use the income and so much of the principal thereof as might be necessary for the support, maintenance and comfort of Mary E. Jasper during her lifetime. The residue was devised to Mrs. Laura Treadway. The testatrix expressly declared in the will that she had intentionally made no provision for her brother, John D. Jasper. The bank was appointed executor. The bank presented the will for probate and the contest was filed in the name of the mother. The mother, Mrs. Jasper, died on August 6, 1933, during the pendency of the action. The estate left by the testatrix was of the value of about $18,000; was earned by the testatrix and her husband in conducting a florist shop in the city of Napa.

Upon this appeal it is urged that the court erred in admitting in evidence the deposition of Mary E. Jasper taken

on the twenty-ninth day of April, 1933; that the court erred in overruling the defendants' objections to certain portions of the deposition of Mary E. Jasper; and in denying the defendants' motions to strike out certain portions thereof; that the court erred in its instructions to the jury; and finally, that there was not sufficient evidence to support the verdict of the jury.

The contest was filed by Mrs. Jasper on the twenty-sixth day of April, 1933. Her deposition was taken on the twenty-ninth day of April, 1933, at the instance of her attorneys. It was taken on a written stipulation prepared by the attorneys for the contestant and is in the following words and figures, to wit:

"It Is Hereby Stipulated and Agreed between the attorneys for the proponent, Bank of America National Trust and Savings Association, a banking corporation, and for the contestant Mary Ellen Jasper, that the deposition of Mary Ellen Jasper, a witness on behalf of the contestant in the above-entitled matter, may be taken before E. P. Locarnini, a Notary Public in and for the County of Napa, State of California, at the home of said witness, 293 Brown Street, in the City of Napa, County of Napa, State of California, on the 29th day of April, 1933, at the hour of 11 o'clock a. m. of said day, and that if said deposition is not completed on said day, it may be continued from day to day successively thereafter and over holidays in the same place until completed, and when taken, the said deposition may be used on trial of said action, subject to the same oppositions, except as to the form of interrogatories, as if the witness were personally present and testifying therein.

"Dated: April 29, 1933."

The notary's certificate is to the effect that on the twenty-ninth day of April, 1933, Clarence Riggins, Esq., and Thomas C. Anglin, Esq., appeared for the proponent, Bank of America National Trust and Savings Association, and that Caulfield & Keil, Esqs., and E. L. Webber, Esq., appeared for the contestant, Mary E. Jasper. No other appearances are shown, and no other parties appear to be represented before the notary upon the taking of the deposition of Mary E. Jasper.

Preceding the reading of the deposition before the jury, objection was made thereto on the ground that the defendant

Laura Treadway was not served with notice of the time and place of taking the deposition; that the stipulation for the taking of the deposition was not signed by Laura Treadway, nor by any person for her. The court overruled the objection and permitted the deposition to be read to the jury. The defendant Laura Treadway did not appear in the action by filing any papers, or otherwise, until on or about the twenty-fourth day of May, 1933. The record shows that Clarence N. Riggins had advised her in relation to her rights in the matter, and some time before the filing of the answer by Laura Treadway, prepared the answer for her. Mrs. Treadway, in her answer, appeared in her own proper person. Thereafter she did appear by her attorney, Clarence N. Riggins.

Section 370 of the Probate Code, relative to the filing of contests against the probate of wills, directs that a citation shall be issued to all persons interested in the will, including devisees and legatees. Section 2031 of the Code of Civil Procedure allows any party to a trial or proceeding to take a deposition before a judge or officer authorized to administer oaths, by serving notice upon adverse parties, giving at least five days' notice of the time and place for the taking of such deposition. The deposition of Mrs. Jasper was taken two days after the filing of the respondent's contest, and therefore precludes any presumption that notice was given to Laura Treadway in accordance with the terms of section 2031, *supra.* The contest filed named Laura Treadway as one of the persons beneficially interested under the terms of the will, as the residuary legatee, which, of course, brought to the attention of the contestant the necessity of giving her notice of the taking of the deposition in question, or of obtaining a stipulation from her for the taking of the deposition, just as was obtained from the proponent of the will. The stipulation prepared by counsel for the contestant sought only a stipulation on the part of the bank, and was signed by counsel for the bank, as requested by counsel for the contestant.

In order that a deposition may be introduced against a party, it is necessary either that the notice required by the code should be given, or that the party should have entered a stipulation for the taking of the deposition. The record in this case shows for whom the parties appeared. The mere

fact that one of the attorneys for the bank afterwards appeared for Laura Treadway, or may have actually been tentatively her attorney at the time of the taking of the deposition, does not make her a party to the taking of the deposition, or constitute an appearance for her. The stipulation itself and the record of the notary taking the deposition, limit the parties appearing therein to the contestant and the bank as the proponent of the will. ██ Oversight or failure to give notice, or to obtain a stipulation for the taking of the deposition cannot be charged to the appellant, Laura Treadway. That notice must be given requires no citation of authority. However, we will call attention to 9 California Jurisprudence, page 411, section 14.

██ In the instant case it is manifest that a separate verdict could not be rendered. It is simply a question of whether the instrument filed as the last will and testament of Julia Jasper Short is, or is not, a valid will. In actions for damages against several defendants, where judgment may be entered against one and not against the other, then the rule adopted in the case of *Jones* v. *Pitcher et al.*, 3 Stew. & P. (Ala.) 135 [24 Am. Dec. 716], applies, where it is said (we quote from the syllabus) : "A deposition taken without notice to all parties is admissible against such defendants as have been notified, provided the nature of the action allows of separate verdicts." See, also, the case of *Hanly* v. *Blackford*, 1 Dana (Ky.), 1 [25 Am. Dec. 114], where the same rule is adopted.

██ Did the court err in overruling the appellants' objection to certain questions propounded to Mrs. Jasper in the taking of her deposition, and also in denying the motion of the appellants to strike out certain irresponsive, irrelevant and incompetent answers? We think so. Before the deposition was read to the jury, it was taken up before the court; objections made to questions and motions to strike out answers; a proceeding which appears to be approved. The court, after insistence of the respondent, held that if objections were not made to questions at the time of taking of the deposition, and a motion made to strike out irresponsive answers, that such objections could not be taken, or motions made at the trial. In this manner the court was led into error. Section 2032 of the Code of Civil Procedure specifically and directly provides that when the deposition is of-

fered in evidence, it is subject to all legal exceptions, save and except as to the form of the questions, in the same manner, and to the same effect as though the witness were upon the stand testifying at the trial.

In the case of *Lawrence* v. *Fulton*, 19 Cal. 683, 684, the precise question which we are considering here was before the court. It was there said: "The objection to this proof was not waived by not being raised when the deposition was taken. By section 430 of the Civil Practice Act, depositions are subject to all legal exceptions at the trial, but the single objection to the form of an interrogatory in case the parties attend the examination." The court in that case excluded certain portions of the deposition. Section 430 of the Civil Practice Act, adopted in 1851 (Stats. 1851, p. 119), is identical in substance and almost identical in language with section 2032, *supra*. It reads: " . . . And thereupon, such deposition may be used by either party upon the trial or other proceeding, against any party giving or receiving the notice, subject to all legal exceptions." It is then provided that if the parties attend at the taking of the deposition, objections to the form of the questions must be made at the time the deposition is taken.

In volume 4, Encyclopedia of Evidence, page 554, the rule relative to objections is thus stated: "In most jurisdictions objections to the competency and relevancy of all or part of a deposition may be made when it is offered in evidence." This rule is supported by a large number of cases, too numerous to be listed, set forth in the footnotes. It may be observed, however, that in a large number of jurisdictions the statutes or codes require notice to be given that objections or motions will be made at the trial, and that such notice must be given a certain number of days before the cause is called for hearing. There are no such provisions in our codes.

The rule which prevails in this state is set forth in 9 California Jurisprudence, page 432, as follows: "Objections to the relevancy or competency of the evidence in a deposition may be made at trial. If, in a deposition, the witness' answer to an interrogatory is not responsive, it may be stricken out." The same paragraph from which we are quoting sets forth the proper procedure as to a preliminary examination of the deposition being given by the court before it

is read to the jury, so that improper and inadmissible answers may be stricken out.

The rules which we have set forth are also to be found in volume 7, Standard Encyclopedia of Procedure, page 438, where it is said: "In many jurisdictions, objections to answers as irresponsive must be made before the trial, but in some states that may be taken at the trial." And then follows a statement of the rules showing that in some jurisdictions notice must be given, as we have stated, preceding the actual date of the hearing, as to what objections and motions will be made.

Under the code sections and the authorities cited, it must be held that the court erred in adopting the rule that objections and motions came too late when only made at the trial, and not at the time of the taking of the depositions.

█ Without further discussion of the law we will here set forth questions and answers where the court overruled the objections of appellants, and also denied their motions to strike out the answers. After some preliminary questions, and some testimony which will hereafter be referred to, the following questions and answers were given: "Q. Do you remember the hour she came there, Mrs. Jasper?" (This refers to a visit made by Laura Treadway to the sanitarium on April 12th.) The answer is as follows: "She came about the noon hour, and I was surprised. I was sitting like you are, and this is Mrs. Short's bed, here, and the door was there (indicating), and the door opened and someone came in, and I looked up; I thought it was strange, because everybody up there always rapped before they came into the room, before they came in the door, and I looked up, and I was sitting there, sewing, and I looked up and I saw Laura Treadway come, and I says, 'What are you doing up here? How did you get here?' And she made some laughing remark, I don't remember just what it was. Well, from that time on she took a seat right there, and I sat there, and this was Mrs. Short's bed right here (indicating), and she laid there all that morning. Mrs. Short didn't know anything; she had laid there all that morning; she didn't even know me."

Counsel for the appellants moved to strike out all of the answer after the words "she came about the noon hour", on

the ground that it was irresponsive, incompetent, irrelevant, etc. This motion was denied.

We may here state, parenthetically, that Laura Treadway came to the sanitarium on April 12th in response to a special delivery letter which had been sent by the deponent to her at the city of Napa on the preceding day. It requires no argument to show that the voluntary statement of the witness was not an answer to any question, and that no foundation had been laid therefor. We will later refer to testimony showing that several people were in the room that same day who testified that Mrs. Short was rational.

The next question which we will consider is as follows: "Q. (By Mr. Webber): Now, Mrs. Jasper, how long did Mrs. Treadway (Laura Treadway), remain in the room where you and Mrs. Short were, if you remember; as near as you can, please tell us. A. How long she remained? Well, I will tell you. We sat there and talked a little while Mrs. Treadway and I, and she always called me 'Duckey' because 'Duckey' is my daughter's pet name for me, and she says to me, 'Duckey, let's go outside. You have been inside so long that you need a little fresh air.' Well, I hesitated because I knew that Mrs. Short was in a very dangerous condition then, for her head was thrown back and her eyes and her mouth were both open, which was unusual for her, and I hesitated at the foot of the bed, and she says, 'Oh, come on. You need some fresh air.' Now, that must have been about one or two o'clock. It might have been two o'clock and it might have been three o'clock, but she took me, Mrs. Treadway did, and I didn't want to go, I didn't feel like I ought to leave Julia, I said, because, if she wakes up, she will want me, and she said, 'Come on, you need a little fresh air,' and she took me by the hand and led me down that long aisle (if you know anything about the Sanitarium up there, you know that long aisle that goes from one end to the other), she took me down to the very furthest seat, except one, on that side (indicating), and she sat me down. 'Now', she says—I mean, 'I says', 'I don't want to go so far because, if Julia calls, I want to be there, I want to be near her,' and she says, 'See here. You can hear her from here. You can hear her from here very easily,' but I knew that I couldn't. So she took me and put me on the outside seat, she

gave me the outside seat and she sat inside, so that I couldn't get out without stepping high, unless I stepped over her feet. There is a stool that sets at the end of the aisle, and she put her foot on that stool and that barred me from getting out, and all of the time I was restless and I didn't want to stay there, and she kept me there, and I says, 'Laura, I must go and see Julia. I know she wants me,' and just as we raised up to go, she hesitated, she hadn't still gotten up, she didn't say, 'All right, we will go then,' but I got up, and just as I did, then I saw the nurse walking hurriedly down this aisle corridor and I then hurriedly got on my feet, and by that time the nurse was there, and she says, 'Which one of you is Mrs. Jasper? Mrs. Short is not so well. We thought maybe'—well, she says, 'You had better come up to her.' So I hurried along as fast as I could, and, when I got there, she was practically dead. She didn't know me or anybody else, and her head was thrown back and her mouth was wide open, and I knew then that she was dead, and then Mrs. Treadway just took me away, and then she brought me home that night.''

To this answer, appellants moved to strike out all except the statement, ''Now, that must have been about one or two o'clock; it might have been three o'clock.'' We may add here that the record shows that it was one of the nurses who led Mrs. Jasper from the room occupied by Mrs. Short, and assisted her down the hallway, and that afterwards Laura Treadway left the same room, went down the hallway and out to a court some distance from the place where the nurse had conducted Mrs. Jasper.

After testifying that Mrs. Short did not sign any papers, the witness was asked this question: ''Well, now, let me ask you this question: On this particular day when she passed away, from your observation of Mrs. Short while she was in bed there, and during the time you were there, what would you say as to whether or not she was competent or incompetent?'' (It appears that this question was objected to not only at the trial, but at the time of the taking of the deposition. The objection was overruled, and was answered as follows) : ''Mrs. Short didn't know anything at all from the time I woke up that morning until she passed away that

afternoon. Q. Well, was she competent, in your opinion, or incompetent? A. She didn't know anything, because she just laid there and slept, and consequently she was not able to sign anything, or any papers." The objection of counsel to these questions and the motions to strike out were overruled and denied.

Subdivision 10 of section 1870 of the Code of Civil Procedure permts the asking of a subscribing witness to a will, and also of an intimate acquaintance, questions eliciting the opinion of the witness as to the mental sanity of the signer of the instrument. The question of competency is for the jury. In support of this statement we need only cite the case of *Estate of Taylor,* 92 Cal. 564 [28 Pac. 603], where it is said: "The capacity of a testator to make a will involves a question of law as well as of fact, and is for the jury to determine under instructions from the court; and the opinion of a witness as to such capacity is not admissible in evidence upon the hearing before a jury of a petition to annul the probate of a will on the ground of the alleged incompetency of the testator."

Another question which elicited a statement apparently intended only to prejudice the jury is as follows: "Q. Did Mrs. Short have some silverware in the house? A. Yes, sir. Q. And do you know what became of it? A. When we left here, that silverware was on the sideboard in that dining room out there, and, when I came back, that was the first thing that I noticed. You know the shock of Mrs. Short's death up there almost made me unconscious, but still I retained enough in my mind to know some things, and, when we came back, the first thing I missed was the silverware off of the sideboard. Well, I never thought anything about it just then. I thought maybe she had given it to some of the neighbors to take care of, to take care of it while we were gone, because we expected to be gone about two weeks, and possibly we would be gone longer than that. So, when I came back, that silverware was all gone, and it was my sister, I think, she told Mrs. Treadway about it; she got to inquiring about it; she had said that we had missed it off of the sideboard, and I think she told my sister that Mrs. Short had given it .to her. Now, I don't believe that Mrs. Short had ever given that silverware to Laura Treadway or anybody else because she fully expected to come back home." Appellants' motions to strike out were denied.

We may here properly insert the proponent's exhibit "F", which shows the disposition of the silverware preceding Mrs. Short's going to the sanitarium. It is as follows:

"Napa, Cal., March 14, 1933.

"Mrs. Laura Treadway,

"Division St., Napa, Cal.

"Dear Laura: I am sending some of my silverware for you to take care of for me. In case of my death I want you to have it as a gift from me regardless of anyone. The half doz. teaspoons & sugar-shell that Minnie Jasper of Wheatland gave me, and half doz. tablespoons that Harry gave me I will lable and want Minnie to have (as they nearly match). Hope this will not be to much bother Will see you when I come back.

"With love.

"JULIA JASPER SHORT."

Two more questions and answers illustrate the irresponsive nature of many of the answers contained in the deposition, which is too lengthy for us to fully set forth herein: "Q. Were there any stronger ties of friendship, as far as you know, between Julia Short and Mrs. Laura Treadway, than there was between Julia Short and any other friends she had? A. No. I will tell you one thing. I have been thinking about that all morning, too. For years Laura Treadway never came inside this house. She never seemed to care any more for Mrs. Short than she did anybody else, and she never came here at all. Well, all of a sudden she took to coming down here and spending her evenings, and brought her work with her." (Appellant's motion to strike out all the answer after the word "no", was denied.) "Q. How long ago was that, when she started to come and spend the evenings with you? A. That was about six or eight months ago; and she came down here, and she is a terrible coward, and, when she would sit here with her work until about ten o'clock, and Mrs. Short and I would sit there and talk; we would talk to her, of course, she was our guest, and then, when about ten o'clock would come, and she would get ready to go home, she was afraid to go home alone in the dark, she was afraid, terribly afraid of the dark, so Mrs. Short always took her home in her car. She got her car out and took her home about ten o'clock at night, she did that, and that kept up for several weeks and I guess maybe for three or four months." (Appellant's motion made to strike out all after

the words, "that was about six or eight months ago", was denied.)

The record shows that Mrs. Jasper was of the age of about eighty-six at the time of the taking of the deposition, and was physically in an enfeebled condition; that her memory did not serve her accurately, is shown by the record in her testimony, to the effect that while she and Mrs. Short were at the sanitarium for practically four weeks, she thought they had been there about three days; that she did not remember who led her from Mrs. Short's room; did not remember having written to Mrs. Treadway on the eleventh day of April, 1933, requesting Mrs. Treadway to call at the sanitarium. The record further shows that when Mrs. Short proposed going to the sanitarium, she asked Mrs. Treadway to make preparations and arrangements at the sanitarium in order that her mother, Mrs. Jasper, might go to the sanitarium and be cared for, on the theory that the mother was unable to care for herself. What we have set forth of the rambling nature of the answers, which should have been stricken from the deposition, we think sufficiently shows that the testatrix had in mind, and kept in thought, the fact that provision should be made in her will for the care of her mother, and that the mother would not be able to care for herself, or for any estate that she, Mrs. Short, might leave, and accounts for the trust provision in the will evidencing that testatrix's clearness of perception that some such provision should be made to insure proper care being given both to the person of her mother and the estate which would be left to be used for her support and maintenance. This is further evidenced by testimony of witnesses which will hereinafter be set forth, showing that the testatrix was anxious to leave her property in such manner that it could not be wasted, and yet would be available for the protection of her mother, whom she felt was unable to care for herself, evidencing not an unnatural will, but the execution of a natural will containing such provisions as would best accomplish the purpose of the testatrix, to wit, the care and maintenance of her mother.

The testimony also shows that the testatrix had in thought that her brother would not probably care for the property, and would be likely to waste the same. There is also testimony in the record that the testatrix and Laura Treadway were very close friends. This intimacy is evidenced by the fact that when the testatrix and her mother went to the sani-

tarium, the testatrix, before going, called upon Laura Treadway to make all the arrangements. The will itself is dated April 12, 1933. It first gives all the property to the bank in trust, to be held, managed and cared for, to use both the income and principal, or the proceeds from any sale from any portion of the estate, for the care, comfort and proper protection of the mother. The will by its terms authorized the trustee to use any portion of the principal that might be necessary to properly care for the mother during the remainder of her lifetime. At the termination of the trust estate, whatever there might be as residue was willed to Laura Treadway. To use her own language, ''To my friend, Laura Treadway.'' The will expressly stated that the testatrix intentionally omitted to make any provision for her brother, John D. Jasper.

The testatrix, at the time of her death, was of the age of about fifty-nine years, and had been engaged in business as a florist for a number of years, and was the owner of a florist shop in Napa at the time of her decease.

Does the testimony in this case support the verdict of the jury and the judgment of the court as to the unsoundness of the mind of the testatrix and her incapacity to execute a will? A careful reading of the testimony leads us to the conclusion that the appeal taken by the proponent and by Laura Treadway is well founded, and that there is in fact no substantial testimony showing incapacity on the part of the testatrix. Preliminarily, in view of the testimony, we may state that the opinion of a lay witness as to the mental capacity of a testatrix has no greater probative force than the facts given by him as the basis of his conclusions. This is clearly set forth in the opinion in *In re Estate of Sexton*, 199 Cal. 759 [251 Pac. 778]. This observation applies to the testimony of the witness, Mrs. Jasper, if it should be considered that the deposition was admissible in this case. Her opinion as to the mental condition of the testatrix was based upon the fact that the testatrix slept a great deal, and that she was very sleepy on the morning of April 12, 1933. There is not a word in Mrs. Jasper's deposition to the effect that the testatrix was in a condition, mentally, so as not to be able to understand the nature of her act when executing a will, the situation of her property, and also the persons entitled to her bounty.

Excluding the portions of the deposition which we have held it was error on the part of the court not to strike out, there is not one word of testimony by any witness in this case to

the effect that Julia M. Short was irrational on the day of the execution of the instrument involved in this action. There is not one word in the testimony to the effect that she had ever been mentally affected; nor one word in the testimony that she did not, on the afternoon of April 12, 1933, recognize exactly what she was doing, the provision which she was making to insure the care of her mother, whom she felt was physically unable to care for herself.

In view of what we have set forth in the record as to the lapse of memory on the part of her mother, and the rambling nature of her testimony, the terms of the will we think indicate that the testatrix realized just what was best to be done with her property in order to protect her mother during the remainder of her life. The testatrix, of course, could not appreciate that her mother would not long survive. All there is in the testimony simply indicates a weakened physical condition of the testatrix, which finally culminated in a heart attack and sudden death.

The disease from which the deceased was suffering when she went to the sanitarium is known as "Bright's Disease", with which she had been afflicted for a long time.

A review of the testimony shows the following: Dr. Baker, a witness called on behalf of the contestant, testified that he had been Mrs. Short's attending physician for two years prior to her death, and that she had chronic Bright's disease, which is known as a disease of the kidneys, or uremic poisoning; that the effect of uremia is that a patient will become more or less comatose; that means, they get drowsy-like. The doctor testified that the last time he saw Mrs. Short was in February at her home in Napa; that there was quite an improvement in her condition at that time; the main complaint she had at that time was extreme weakness; the albumen in the urine indicated kidney destruction. When the kidneys do not function the uremia is kept in the blood. It affects all the organs of the body and the mind. It produces coma and a comatose condition. Mrs. Short was mentally clear the last time I saw her. The true cause of her death was due to the kidneys, but she could have had a heart attack at that time, and the heart attack could cause death. Dr. Baker testified that the last time he treated Mrs. Short was shortly before Christmas; that he examined her heart at that time; that it had a condition usually found in chronic nephritis, leaky valves and an enlargement of the heart; that Bright's disease

weakens the heart in two different ways. First, usually high blood pressure under which the heart generally weakens. Second, it affects the heart directly by the poisoning of the uremic conditions over the body, including the heart muscles; that at any time the heart becomes overtaxed and stops functioning, the patient dies. "I found a dilation of Mrs. Short's heart when I treated her. Either the Bright's disease so poisons a person that they lapse into a coma and die therefrom, or before they come to that stage, the heart itself fails and they die from a failure of the heart to pump the blood through the system. I cannot say which is the most common." The doctor testified that he did not see Mrs. Short after February, and had no personal knowledge of what took place at the time of her death, and further, that the last time he saw Mrs. Short, her mind was clear. The doctor further testified as follows: "I would not say that all persons who have Bright's disease have an unsound mind. In a complete coma the patient lapses into unconsciousness, which will first manifest itself in drowsiness. If a patient does not die from failure of the heart to function, they will gradually lapse into complete unconsciousness and pass out that way. The last time I saw Mrs. Short on February 28th, her mind was clear, and she had suffered from Bright's disease for several years. She was running a florist business and attending to her business during the two or three months that I treated her. · I would say she was mentally able to carry on the business. I cannot say from my own observation and knowledge that Mrs. Short ever became of unsound mind." The substance of the doctor's testimony was simply that Mrs. Short was suffering from Bright's disease, and that if she did not die from heart failure, in due time the progress of the disease would cause her to lapse into a coma, and then to pass out in that condition. There is nothing, as we have stated, in his testimony to warrant the conclusion that Mrs. Short was of unsound mind at the time of the execution of the will, or even at the time of her death.

Two physicians who saw the patient on the day of her death, Dr. Vollmer and Dr. Nelson, both testified that Mrs. Short's mind was clear, and that she died from failure of the heart to function.

Laura Treadway, called for cross-examination by the contestant, testified as follows: That she had lived in Napa all her life; knew Mrs. Short and her mother for over thirty-five

years; had visited their home very frequently on an average of once a week or more; that she and Mrs. Short were very close friends; that Mrs. Short had been ill for some time; that she made the arrangement for Mrs. Short to go to the St. Helena Sanitarium at the request of Mrs. Short; that the mother went with Mrs. Short, and occupied the same room. (Parenthetically we may say that the two women occupied twin beds in the same room.) The witness stated that she saw Mrs. Short on April 10th; visited her April 10th, just before noon; visited her again Monday evening, testifying as follows: "I went to Mrs. Short's room. She was in bed. Her mother and the nurse were there. I just said, 'Hello, Julia,' and she said, 'Hello, Laura.' She said, 'Sit down,' and I said, 'How are you feeling?' She said 'Pretty good.' I said, 'Everything is going along nicely' " (referring to her business). The witness further testified: "Two young ladies were running it, and one was with me at the time; she had driven me up to the sanitarium. I went back to the sanitarium Monday evening. The girls from the store went up with me. I remained there about an hour and a half. Mrs. Short had a nurse. I did not see the nurse give her anything. Mrs. Short did not complain of anything. I went up again on Tuesday evening because Mrs. Jasper had sent me a special delivery letter that I received Tuesday. The brother of one of the girls in the store took me up." The witness testified she did not talk very much to Mrs. Short because the nurse asked her not to do so; that Tuesday night she noticed a change in Mrs. Short's condition; that she was not quite so well; that she had a talk with Mrs. Short's doctor after she left Mrs. Short.

Dr. Nelson said that their latest test did not look good; asked if Mrs. Short had her business arranged. Dr. Nelson asked if the witness knew who Mrs. Short's attorney was. The witness replied, "Mr. Riggins." The doctor said, "Mr. Riggins? I know him very well. Get in touch with Mr. Riggins and bring him up here so that Mrs. Short will be given an opportunity to straighten up her business affairs." The witness testified that she called on Mr. Riggins at his office the following morning, April 12th; told him of the conversation with Dr. Nelson, and that she knew it would be the wish of Mrs. Short that the mother should be protected during her lifetime. That day, April 12th, Mr. Riggins, accompanied by the witness, went to the sanitarium and to Mrs. Short's room. When she

got there she motioned to the nurse, who stepped out into the hall with her, and she explained her errand to the nurse. I told her that Mr. Riggins wanted Mrs. Jasper to leave the room. The nurse asked Mrs. Jasper to leave, and she went out with the nurse. I then went back and stepped over to Julia. I said, "Julia," and she said "Yes." I said, "Julia, do you remember on many occasions you have said to me that in case you were to pass away you would like to be given the opportunity to make a will?" And she said, "Yes." I said, "Now, Dr. Nelson tells me you are having quite a little spell, and, while you may come out of it all right, in case you do not, she thinks you should be given the opportunity to straighten up your business affairs, if you care to." I said, "I have brought Mr. Riggins up here with me for that purpose. Would you like to see him?" And she said, "Good, Laura."

The witness then asked Mrs. Short if she should bring Mr. Riggins in, and Mrs. Short said yes. Mr. Riggins came in and asked the witness to leave the room, and she went outside the building. Afterwards Mr. Riggins called her back to the room for a minute, and said Mrs. Short had said there were some papers in the dresser drawer, and asked her to look for them, as he did not like to look through Mrs. Short's things; that she looked, but found nothing of consequence, and again left the room. The witness testified that she remained out of the room until after the will was executed and Mr. Riggins came out of the room, and testified that she remained in the room with Mrs. Jasper until the nurse called her back into the room. When the witness returned to the room she found Dr. Nelson and two nurses with Mrs. Short.

Clarence Riggins, a witness called by the contestant, after testifying that he made certain preparations which would aid in drafting a will, and stating that he went to the sanitarium by automobile, after reaching the sanitarium testified to the following facts, after entering Mrs. Short's room: "Mrs. Jasper was out of the room when I arrived. I spoke to Mrs. Short and asked her how she was, and she spoke to me. I know that she knew me. I asked Mrs. Treadway to go out before I said anything to Mrs. Short in a business way. I told her that I had been asked by Mrs. Treadway to come up for the purpose of making such arrangement of her affairs, if anything happened to her, as she would want, and I did not want to intrude myself on her unless she wanted me. She said she did. I said, 'Well, you have an old mother who

ought to be protected and taken care of during her lifetime,' and that I would advise either the making of a trust deed or will for the purpose of taking care of the property for the benefit of her mother during her lifetime, and using both the income and principal, if necessary, for the mother, and that at the time of her mother's death, the balance to go to whomever Mrs. Short wished. I said further, 'I haven't time to make a deed, and when you get back to Napa, if you want, we can make a deed, but I think you had better make a will at this time.' She said she thought there might be some deeds or papers in the bureau. I did not want to look in the drawer myself, and I stepped out and called Mrs. Treadway back to the room, and asked her to look. Mrs. Treadway opened the drawer and we found a few papers, but there was nothing of any assistance, and I asked Mrs. Treadway to again leave the room. Mrs. Short was propped up in bed with pillows. I did not notice her breathing. I had no trouble in understanding everything she said to me, I am satisfied she understood what I said to her. After looking in the drawer I told Mrs. Short there was nothing in the drawer that would be of any assistance to us, and I thought she should make a will, such as I have explained, for her mother's protection, if she wanted it that way, and she said, 'All right, go ahead.' I sat down at the table next to the window and took out my material and started to prepare the will. I used in writing the will an ordinary steel pen that was lying there. . . . I did not know Mrs. Treadway's first name, and when I came to write it in the will, I asked Mrs. Short what the first name of Mrs. Treadway was, and she spelled it out for me. I also asked her if Mrs. Treadway was not the former wife of a man, who at one time lived in Napa, mentioning him to Mrs. Short, and she said she was.''

The witness testified, after discussing with Mrs. Short the provisions of the trust for taking care of the mother during her lifetime, he asked Mrs. Short whom she wanted to take the remainder after her mother's death, and she said ''Mrs. Treadway''. He also asked her if she did not want to make provision for her brother, and she said ''no''. He explained to Mrs. Short that it would be necessary to name a trustee, and mentioned the Bank of America, and told her the trustee would be paid commissions, and asked her whom she would prefer, and she said she wanted the bank. He testified, further, that no one other than Mrs. Short suggested anything to

him as to the disposition of her property by the will, and that Mrs. Treadway did speak to him about Mrs. Short's mother being protected; that after completing the writing of the will he sat down by Mrs. Short's bed and read the will to her, explaining those portions that he thought might require explanation, while he was reading the will; that when he was nearly through reading it, the door opened and a nurse, Miss Magee, came into the room and gave Mrs. Short something she took from a stand between the two beds (the testimony elsewhere shows that the patient was given lemon water quite frequently as an antidote for nausea); that he stopped reading the document when the nurse came into the room, but said to the nurse, in the presence of Mrs. Short, that he had been preparing a will, and that he would like to have Dr. Nelson (Mrs. Short's doctor), act as a witness if agreeable to Mrs. Short; that he then discontinued reading of the will; that the nurse came back and said that Dr. Nelson was away, but that she could get Dr. Vollmer; that a few minutes later Dr. Vollmer came into the room, and at that time he stated to Dr. Vollmer, in the presence of Mrs. Short, that he had prepared her will, and that he would like to have him act as a witness, if he was satisfied in his own mind that Mrs. Short was in a condition to make a will, and Dr. Vollmer turned and talked with Mrs. Short, and then he said it would be all right for her to make a will. The witness testified that he had already asked Mrs. Short, in the presence of Dr. Vollmer, if he had read the will to her, and she said that he had; that when the nurse was there he asked Mrs. Short if the will was clear to her, and she said it was; that he thought that was in the presence of Dr. Vollmer, also. The testimony of the witness is also to the effect that Mrs. Short then signed the will, and in signing the will it became necessary to change the pens which had been offered to Mrs. Short for her use, on account of a defect in one of them.

After the testatrix had signed the will, the witness Riggins and Dr. Vollmer signed the same as witnesses. The witness testified that he had known Mrs. Short for nearly twenty years; that he had acted as her attorney on previous occasions; that at the time of the execution of the will, Mrs. Short's mental condition was excellent; that she had sufficient mental capacity to be able to understand the nature of the act which she was doing, and to recall the nature, situation of her property, and the claims of those who were entitled to

her bounty. The witness testified that he explained to Mrs. Short that a private person could be selected as a trustee, or the bank might be selected, and that Mrs. Short made her selection of the bank. "When I read the will to Mrs. Short she stated that she understood its provisions, and at that time she had the appearance of a rational, intelligent woman, and answered all questions intelligently."

Dr. Vollmer, called as a witness, testified that he was a physician and surgeon at the St. Helena Sanitarium; had been there for ten years, that he knew Julia Short; saw the document that was offered in court as her last will; that he entered the room of Mrs. Short about 3 o'clock in the afternoon on April 12, 1933; that he turned to Mrs. Short and greeted her, and asked her how she was, and that he noticed her condition. He testified that in his opinion she was competent to sign a will; that the name "Julia Short" was written by Mrs. Short herself; that Mrs. Short remarked she could not sign it lying in the position that she was in; that he sent for a nurse and she came in and assisted in propping her up with pillows; that the nurse was Miss Elsie Magee, who remained in the room while the will was signed; that Mrs. Julia Short wrote the entire signature that appears upon the will; that she said it was her will and wanted them to sign as witnesses. The witness further testified as follows: "At all these times I observed Mrs. Short. Her mind was clear. In my opinion at the time Mrs. Short signed the will, and at all times during that day when I was there, Mrs. Short had sufficient mental capacity to understand the nature of a will, and to be able to understand the nature and situation of her property, and remember and understand her relations of the persons who had claims upon her bounty, and who are interested, or would be affected by the provisions of her will." He further testified that Mr. Riggins asked Mrs. Short, while he was there, if she wanted him to read the will over again, and she said it was not necessary; that he was in the room ten or fifteen minutes; that the will was signed between 3 and 4 P. M.; that the amount of uremia shown by the chart was not sufficient to affect Mrs. Short's mind; that she did not die from toxic poisoning, but from heart failure; that it is true that ordinarily there are two ways in which we may have a fatal termination; one is, they go under a coma, or the picture may be terminated by a sudden heart breaking or failure; that this was so in Mrs. Short's case; that one can

never tell in these cases which is going to be fatal, whether they will terminate suddenly by heart failure, or whether they will terminate in uremic coma; that the majority of these cases, in his experience, in this type of Bright's disease, terminate by heart failure.

Miss Elsie Magee, a witness called by contestant, testified that she was a nurse at St. Helena Sanitarium; that she remembered Julia Short; was a special nurse on her case. The witness also testified concerning a daily report which she kept of entries made by Lulu White (another nurse), and herself. The chart was admitted in evidence. The witness testified that she arrived on the case at about 1 o'clock in the afternoon; gave Mrs. Short lemon water, and made an entry on the chart at that time; at about 1:20 the same afternoon she gave Mrs. Short another teaspoonful of lemon water; that Dr. Nelson entered about this time; that she was the attending physician; that at 1:30 she gave Mrs. Short another teaspoonful of lemon water, and at 1:40 gave her rice water; at 1:50 gave her lemon water; at 2:00, rice water; at 2:10, more lemon water; at 2:20 rice water; at 2:40, a teaspoonful of rice water; that at 2:50 Mrs. Short was left alone in the room with Mrs. Treadway; that Mrs. Treadway came in at 2:40; that there were friendly greetings between Mrs. Treadway and Mrs. Short and her mother; that at ten minutes past 3 that afternoon, another teaspoonful of lemon water was given Mrs. Short; that at 3:30 she took Mrs. Short's pulse and asked the patient if she was comfortable; that when she entered the room the will was being read to her (Mrs. Short). The witness testified that she did not hear any of it, but she did hear attorney Riggins ask Mrs. Short if it was plain, and heard her answer, "Yes, it was"; that she was there when the will was signed. She further testified that the chart did not show the conversations with Mrs. Short; that when she gave her the lemon water she said it was refreshing and tasted good; that Mrs. Short was lying in bed, propped up with pillows; that when Dr. Nelson came in Mrs. Jasper was sitting in an easy-chair at the foot of Mrs. Short's bed. The witness testified: "I went out in the hall with Mrs. Jasper. Mrs. Treadway did not go with us. We went to the fish pond. It is on the opposite side of the building from the court." (Mrs. Treadway testified that she went out to the court.) "I saw Mrs. Short again after I went out with Mrs. Jasper. It was about 3:30." It was when he asked her if the will was plain, and

she answered, yes, it was plain. The witness further testified that Mr. Riggins asked her to call Dr. Nelson; that she was unable to find her, and called Dr. Vollmer; that she was asked to put Mrs. Short in a better position for writing; that she added a pillow to Mrs. Short's back; that Mrs. Short started to write, "Mrs. Harry Short", and was told to write her own name; that they left shortly after the will was signed; that she wrote up the chart that night from the pad; that no medicine was given Mrs. Short by her on that day; that no hypodermic injections were given her; that at 4:15 Mrs. Short was wide awake, and very talkative, saying she was very glad to know that her mother would be taken care of; that she spoke of Mrs. Treadway being her best friend, how good she had been to her mother, and how they all loved her. The witness testified that Mrs. Short's appearance that day, up to the time she executed the will, her conduct, demeanor and conversation, indicated she was very rational; that she based her opinion upon Mrs. Short's conversation, answers to questions, her actions, and the witness' experience with patients like her.

Dr. Ida S. Nelson, a witness called by the proponent, testified that she had been a member of the medical staff at the sanitarium for twenty-two years; that she was the attending physician for Julia Short; that Julia Short died on the twelfth day of April, 1933; that she saw Mrs. Short once and twice a day during the four weeks she was there; that the disease was diagnosed as "Bright's Disease"; that Bright's disease may cause the heart to become weakened, and the heart valves may give out; that she saw Mrs. Short three times on the day of her death about 11 o'clock; then a little after 12 o'clock; and then around 5 in the afternoon; that the condition of her mind the first two times she saw her that day was normal bright; that when she saw her at 5 in the afternoon her mind was still clear; that at that time she was suffering from a heart attack; that she died at 6 that afternoon; that when she went into the room at 5 o'clock, the superintendent was there and the nurse, Miss Magee; that Mrs. Jasper was not in the room; that no oxygen was administered to Mrs. Short the day of her death; no medicines of any kind were administered to her the day of her death, except a heart stimulant just a few minutes before she died; that Mrs. Short had told her, soon after she came to the sanitarium, that she and Mrs. Treadway had been girl friends; that Mrs. Treadway

was her best friend, and that they had been present at each other's weddings.

Lulu White testified that she was one of the nurses for Mrs. Short; that Mrs. Short was rational at all times; that everything Mrs. Short said, and everything she did would indicate that she was rational.

Miriam Stevens, a night nurse on the case, testified that Mrs. Short's manner and conversation were always rational; that she talked about different things; about the flower shop; about her friends; answered questions in a rational manner; that she always answered as anybody else would, and that she did not have any reason to think that she was not rational.

Catherine Epp, medical superintendent at the sanitarium, testified that she visited Mrs. Short every day while she was there; the first time, April 12th, it was probably about 1:30; the second time, about 4 o'clock in the afternoon; that she had a conversation with Mrs. Short when she was there at 4 P. M.; that Mrs. Short's manner and words at that time were rational; that her reasons for believing that Mrs. Short was rational were that she answered all questions like anyone else would answer the same.

The testimony of E. O. Heinrich relative to the signature of Mrs. Short is of no importance. It was to the effect that different inks had been used in the signature. The witnesses to the will testified that a change was made in the pens given to Mrs. Short on account of some defect therein. This, of course, has no bearing upon any issues presented upon this appeal.

In connection with the testimony of the nurses, the charts kept by them were introduced in evidence, showing the condition of the pulse, temperature, etc., of Mrs. Short, from day to day. In view of the testimony of Dr. Vollmer that the charts did not show sufficient uremia in the blood to affect Mrs. Short's mind or mental condition, we do not deem it necessary to lengthen this opinion by a discussion of what is exhibited by the charts. We may note, however, that Dr. Baker, upon whose testimony contestants place great reliance, did not testify that the charts showed sufficient uremia to affect the mental condition of Mrs. Short, his testimony going only to the effect that uremic poisoning might affect not only the physical, but the mental condition of a patient, and not that such was the case with Mrs. Short.

A number of witnesses were called and testified as to the friendly relations between Mrs. Short and Mrs. Treadway, and also, there is testimony in the record indicating, to say the least, that the brother of Mrs. Short was not frugal in his habits.

As indicating, and, as we think, clearly establishing the mental condition of Mrs. Short, and her capacity to understand the nature and condition of her property and those who were entitled to her bounty, we incorporate in this opinion a letter written by Mrs. Short after she had been at the sanitarium for about three weeks. The letter is somewhat lengthy, but it speaks forcibly for itself:

Sanitarium, Sat. A. M.

''Dear Aunt Dixie and Carrie:

''We received your letter and was glad to hear from you. We expect to go home this Wed. Will be here three weeks. Am lots better but do not feel like I can afford to stay here longer. The ink has given out. Now, Aunt Dixie, I don't want you to feel like you have to be nurse again after all you and Carrie have gone through this winter. We will be glad to have you, but it will not be much joy around for awhile, for I am so weak and shaky that I can't do very much. I have had a woman come once a week since I have been sick, and clean and dust. Mama has picked up and looks fine. I have gained eleven pounds. My kidneys are still bad, but will be O. K. I certainly will be glad when I am well again; seems like have had a little too much. I am just crazy about this place; so restful and quiet; although we get lots of company and callers. This is an Adventist affair, but their religion is all right with me. I do not think Genevieve is going to Italy; do not think she has enough money. At any rate I am not going back to the store for awhile, not to work at any rate. Never thought I would have to draw a line on myself. Aunt Dixie, if you do come be sure and bring your table-cloth, for I want you to get that finished, and the front porch will be a good place to see your work. Well, Carrie, you certainly earned yours with the coal. I do not see how you stood it, but I tell you there is grit there. It is too bad that some of it can't be spread on some of my *in-laws*. Lazy huzzy, excuse the English. Marion expects the stork again in July, and is coming up here. Laura comes up every day or two. I do not know what would have happened to me if not for her, as she was the only one close by. Now, do not

worry about me because I am doing fine, and if you would like to come, we will make it as pleasant as we can, but do not want you to neglect your own there. I think it mighty nice that you would come all that way and expense for us. Let us hear from you at home, as we will be home when you get this, I think. Brother is not working yet, but they are too busy doing nothing to be bothered with us. I will tell you a few things when we see you. Will close for this time with lots of love.

"JULIA."

Other letters written by Mrs. Short while at the sanitarium likewise indicate the clearness of her mentality, but we think the foregoing sufficient.

In view of the fact that there is no substantial testimony in the record, as shown by the foregoing, of any lack of capacity on the part of Mrs. Short to execute a will, it seems almost unnecessary to review any of the cases cited either by counsel for the proponent or by counsel for the contestants. We will, however, refer to a few cases, some of which were decided by this court.

Contestants place reliance upon the case of *Estate of Alexander,* 111 Cal. App. 1 [295 Pac. 53]. A reference to the facts in that case shows that a number of witnesses testified as to the extreme age of the testator, his illiteracy, his feebleness, his eccentric habits, the manner in which he acted, indicating that the testator was afflicted with senile dementia. There is no testimony of that kind in the instant case. Mrs. Short was not a woman of extreme age.

In the *Estate of Johnson,* 72 Cal. App. 663 [237 Pac. 816], the testimony of a number of witnesses was to the effect that Johnson was of unsound mind, and further shows that he was adjudged insane and committed to the State Hospital for the Insane at Napa. An examination of that case shows from the acts and conduct, conversation, etc., of the testator, that he was suffering from some form of paresis. In that case physicians testified to the fact that Johnson was suffering from softening of the brain.

We do not need to cite authorities to the effect that testamentary capacity is always presumed, and while physical weakness may be considered, that alone is not sufficient to support a verdict setting aside a will.

As completely answering every legal question that can be raised in that case as to the capacity of Julia M. Short to

execute a will on the twelfth day of April, 1933, we cite the cases of *Estate of Sexton*, 199 Cal. 759 [251 Pac. 778] ; *Estate of Dolbeer*, 149 Cal. 227 [86 Pac. 695, 9 Ann. Cas. 795] ; *Estate of McDonald*, 109 Cal. App. 577 [293 Pac. 651] ; *Estate of Finkler*, 3 Cal. (2d) 584 [46 Pac. (2d) 148].

It follows from what we have set forth herein that the order of the trial court denying proponents' motion to admit the will to probate notwithstanding the verdict, should be, and the same is hereby, reversed. That the judgment of the trial court based upon the verdict of the jury denying probate of the instrument filed as the last will and testament of Julia M. Short, deceased, be, and the same is hereby reversed, and the cause remanded to the trial court with directions to admit the writing, dated April 12, 1933, to probate as the last will and testament of Julia M. Short, deceased.

Pullen, P. J., and Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 12, 1935.