[Civ. No. 4389. Third Appellate District.—July 27, 1931.]

In the Matter of the Estate of MARY B. EHLE, Deceased. LAURENCE BARBER et al., Respondents, v. PHOEBE BOATRIGHT, Appellant.

R. M. Hardy, William H. Metson and A. H. Ricketts for Appellant.

Samuel G. Tomkins and James A. Nutting for Respondents.

JAMISON, J., *pro tem.*—On November 2, 1928, Mary B. Ehle made an olographic will as follows:

"November 2, 1928

"My Will

"I leave to Phoebe Boatright everything I have at my death and I appoint her Executrix without bonds.

"MARY B. EHLE
"ARIETTA ESTELLE COFFIN
"ORA LEE BOATRIGHT"

Contestants, who are nieces and nephews and the heirs at law of testatrix, filed a contest against the probate of said will, alleging therein as grounds for said contest: 1. Testamentary incapacity; 2. Undue influence of Phoebe Boatright; 3. Deceit and fraud of Phoebe Boatright.

The proponent answered denying the alleged grounds of contest and the issues thus formed were submitted to a jury, which returned a verdict in favor of contestants upon all of said alleged grounds. Appellant moved for a new trial and for judgment notwithstanding the verdict, which motions were denied. From the order denying the motion for judgment notwithstanding the verdict and from the judgment proponent prosecutes this appeal.

The facts surrounding the execution of this will are substantially as follows: The testatrix, at the date of the execution of this will, was ninety-one years of age and was feeble in mind and body. Dr. Hiram Ehle was her only child and for many years had provided for her care and support. He was a practicing physician of Susanville, California, and was sixty-eight years of age at the date of his death, which occurred on the twenty-eighth day of October, 1928. Some eight years before his death he had placed the testatrix with appellant, who lived in Susanville, paying her for the care and support of his mother $60 per month during all of that time. Testatrix had no means of her own and was entirely dependent upon her said son for her means of subsistence.

Dr. Ehle had a cousin named Alice Barber, who was a niece of the testatrix, who died in San Jose, California, on October 16, 1928, and who had left a will devising to Dr. Ehle 75 acres of orchard land of the value of about $45,000. Dr. Ehle left Susanville to attend the funeral of his said cousin but, becoming ill on his way, was forced to stop in San Jose, where he died on the twenty-eighth day of October, 1928. He also, some years prior to his death, had made a will in favor of his said cousin, leaving all of his property, amounting to several thousand dollars in value, to her, with a proviso that if his death preceded that of his mother, that from the funds bequeathed his mother should be kept and cared for in like manner in which she was then being cared for.

The evidence as to the testamentary capacity of the testatrix at the date of the execution of the will is conflicting.

Respondents produced several witnesses who testified that the mind of the testatrix was unsound. Among them was Dr. Martin, who testified that he had known the testatrix for about eight years and that during that time he on several occasions had been called to attend her professionally, that he last saw her about February 8, 1929. At this time she was in bed, was very feeble, practically blind, living in the past, and that she was of unsound mind, totally incompetent to form any opinion as to the value of property; that she would not know the nature and extent of property if it were told to her and that this condition of her mind had existed for more than a year before that time. Another witness produced by respondent was Dr. Coll, who testified that he went to see the testatrix about the 8th of February, 1929, for the purpose of ascertaining her state of mind. He found her in bed, that she was old, senile, and very weak mentally, with no co-ordinating mentality, lying lost in the past, with no thought of the future; that she did not have sufficient mental capacity to know the value of any property that she might possess, and that this condition had existed for a year and maybe longer.

Respondents also produced three witnesses, intimate acquaintances of the testatrix, who testified that the mind of the testatrix was unsound. On the other hand, appellant produced four or five witnesses, who were intimate acquaintances of the testatrix, who testified that the mind of the testatrix at the date of the execution of the will was sound, and among these witnesses was Dr. Collings, who attended her professionally from October 10, 1928, until July 21, 1929, and whose testimony was to the effect that during all that time her mind was sound.

There was received in evidence, without objection, the record of the Superior Court of Lassen County, showing that on February 8, 1929, the superior court of that county appointed a guardian for the person and estate of testatrix upon the ground that she was mentally incompetent to care for herself and her property. The judgment in this incompetency proceeding was evidence of the mental condition of the testatrix on the date of its rendition. (*Estate of Johnson,* 200 Cal. 299 [252 Pac. 1049].) And while of itself it may not establish the want of capacity sufficient for making a will, it is certainly evidence proper

to be considered on the issue of testamentary capacity at the time of the appointment of a guardian. And where there is testimony tending to show that the mental condition of the person has not changed between the date of the act in question and the appointment of a guardian, although later in time, the testimony is admissible on the issue of capacity when the act was done. (*Estate of Loveland*, 162 Cal. 595 [123 Pac. 801].) It is the settled law of California that an adjudication of the incompetency of a testator is evidence of his incapacity to make a valid will. (*Hellman Commercial T. & S. Bank* v. *Holden*, 206 Cal. 592 [275 Pac. 794].)

The testimony of the two doctors produced by respondents tended to show that the mental condition of the testatrix, as it existed at the date of the judgment declaring her incompetency, had not changed between that time and the date of the execution of the will, something over three months before.

Testatrix was not informed of the death of her son, Dr. Ehle, and died without knowledge of that fact. At the time she executed her will to appellant she was ignorant of the fact that she had inherited through her said son his estate, including that which had been willed to him by her said niece, aggregating $55,000. These facts, according to the evidence of appellant, were known to her at the date of the execution of the will and yet she admits that she did not disclose them to the testatrix, knowing that the testatrix was entirely ignorant of their existence, although appellant claims that prior to the execution of the will she informed the testatrix, immediately after the said niece's death that she, the testatrix, had fallen heir, through the death of said niece, to a lot of money, but that the testatrix made no inquiry as to the amount or value of the money or property to which she had fallen heir.

A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand, his relation to the persons who have claims upon his bounty and whose interests are affected by the provisions of the

instrument. (*Estate of Sexton,* 199 Cal. 759 [251 Pac. 778]; *Estate of Ivey,* 94 Cal. App. 576 [271 Pac. 559].)

Testatrix believed that her son, Dr. Ehle, was living at the date of the execution of the will, and with that belief existing in her mind she willed all of her property to appellant, who was no blood relation, although testatrix was devoted to her said son and there is no reason why she should have disinherited him.

While a person has a legal right to make an unnatural will, the fact that it is so may be considered with the other evidence of mental unsoundness in determining the mental capacity of the testator (*Estate of Johnson,* 72 Cal. App. 663 [237 Pac. 816]), and such a fact has weight in determining whether a testator was mentally competent at the time of executing the will. (*Estate of Martin,* 170 Cal. 657 [151 Pac. 138]; *In re Wilson,* 117 Cal. 262 [49 Pac. 172, 711]; *Estate of Gallo,* 61 Cal. App. 163 [214 Pac. 496].)

The will was executed on November 2, 1928. Appellant's version of how it came to be made was as follows: ''I said 'One thing I want you to do, Mrs. Ehle, before you die, and that is to will me your education' and she said, 'That is impossible.' 'I would if I could,' but she says, 'I tell you what I might do, I might will you something to get an education because you never get too old to learn' and I said 'Will you do that for me?' and she said 'Yes, I will.' I said, 'You will have to have that in black and white' and she said 'If I am in my right mind when I die I will write that out for you.' I said, 'Are you in your right mind now?' and she said, 'I think so.' I said, 'You mean that?' and she said, 'I do. You have done more for me than anyone else. None of the rest of them take care of me.' I says, 'Well, if you mean that I am going to see an attorney,' and she says, 'All right, go on.' ''

Appellant then called on R. M. Hardy and was informed by him that he could typewrite a will but that it would be better for testatrix to write it out herself. ''He said 'You go back and let her write it out any way she wants to.' He said, 'I leave everything I have to Mrs. Boatright, something like that.' He said, 'I will come down and see if it is all right.' '' On her way back she asked Mrs. Coffin to come down and be present, as Hardy had told her she

had to have a witness. When appellant got back home she said to the testatrix: " 'I have seen a lawyer. He told me for you to write that out yourself. Can you do that?' and she said 'I think I can.' A table was sitting by the bed with papers and books and pen and ink and I said 'You write it any way you want to. If you want me to have that, I leave everything to Phoebe Boatright' and she said, 'that will be all right.' When she got down to executrix, she said something about executor without bonds, and Mrs. Coffin spoke up and says 'She is a lady executrix' and she hesitated about that. I spelled it with one 'E' and she said 'two E'? and I looked it up and it was all right. She wrote it all down, every word. When it come to the part to sign her name she hesitated about her full name or initials—Mrs. Coffin said, 'It would be Mary B. Ehle, wasn't that your maiden name,' and she said 'Yes' and wrote it that way.''

Appellant then took the will back to Hardy and he informed her that the will was not dated and that he would call later to have it corrected. Later in the day Hardy called and had testatrix insert the date. At that time Hardy asked her if she realized that she had fallen heir to money and she said ''Yes'' and then he asked her if she wanted appellant to have it and she said she did.

The testatrix for a period of eight years prior to executing the will had lived in the home of appellant, had been cared for in a manner that had gained the friendship and confidence of this aged woman. During the latter part of that period the testatrix had become almost blind, had become partly bedridden; the twilight of extreme old age was gradually enveloping her, rendering her weak in body and mind. There was evidence to the effect that what mind remained to her was centered in the past with no thought of the future, and that she had become wholly dependent upon appellant.

In the *Estate of Graves*, 202 Cal. 258 [259 Pac. 935], Mr. Chief Justice Waste used the following language, which can appropriately be applied to the facts of this case:

''Three well-established facts, among others, which are recognized as being indicative of undue influence, or a subversion of a decedent's volition, stand out clearly in the record: The relations between appellant and decedent af-

forded to appellant an opportunity to control the testamentary act; the decedent's condition was such as to permit of a subversion of her freedom of will; the appellant was active in procuring the instrument to be executed. In addition, appellant unduly profited as beneficiary under the will. While none of these circumstances, standing alone, has the effect of creating a presumption against the validity of the instrument, their probative force, in combination, is to impose upon the proponent the obligation òf presenting evidence of volition, and to make the question as to undue influence one of fact for the jury. . . . Appellant correctly contends that mere proof of opportunity to influence the mind of the testatrix, even though shown to be coupled with interest, or a motive to do so, does not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly on her testamentary act. . . . But in this case it clearly appears that the appellant took an active part in securing the execution of the will at a time when there existed a confidential relation between himself and Mrs.´ Graves. The rule is well settled that 'where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actively participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud' (citing authorities) and that 'a presumption of undue influence arises from proof of the existence of a confidential relation between the testator and such a beneficiary, coupled with activity on the part of the latter in the preparation of the will. (*Estate of Higgins,* 156 Cal. 261 [104 ·Pac. 106].)' (*Estate of Relph,* 192 Cal. 451, 465 [221 Pac. 361, 367].)''

Appellant contends that the court erred in admitting the testimony of respondents' witnesses, who gave their opinions regarding the mental sanity of the testatrix, because these witnesses had not qualified themselves as intimate acquaintances. The determination of the question whether or not a witness has shown himself to be an ''intimate acquaintance'' is committed in the first place to the sound discretion of the trial court. It is only upon a clear showing of abuse of such discretion that the ruling thereon will be disturbed on appeal. (*Estate of Relph,* 192´ Cal.

664

451 [221 Pac. 361]; *Huyck* v. *Rennie,* 151 Cal. 411 [90 Pac. 929].) From an examination of the record we think the trial court was well within its rights in admitting the testimony of these witnesses and that there was no abuse of discretion in so doing.

Other alleged errors are claimed to have been committed by the trial court which we do not deem it necessary to consider.

 We are of the opinion that there was substantial evidence to support the verdict of the jury and such being the case it will not be disturbed on appeal. (*Estate of Snowball,* 157. Cal. 301 [107 Pac. 598]; *In re Estate of Russell,* 189 Cal. 759 [210 Pac. 249].)

The order denying the motion for judgment notwithstanding the verdict and the judgment are affirmed.

Preston, P. J., and Thompson (R. L.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 26, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 24, 1931.