[Civ. No. 7544. Third Dist. Mar. 31, 1949.]

Estate of EMANUEL ABERT, Deceased. HENRY J. ABERT et al., Respondents, v. ERNEST ABERT, Individually and as Executor, etc., Appellant.

Preston & Falk for Appellant.

Albert Picard for Respondents.

THOMPSON, J.—Ernest Abert, proponent, has appealed from a judgment rendered pursuant to the verdict of a jury, denying probate of the last will of his father, Emanuel Abert, deceased, on the ground that the will was procured by proponent's undue influence.

The appellant contends that the judgment is not supported by the evidence.

The deceased was a widower 82 years of age at the time the contested will was executed on November 13, 1944. He died August 1, 1945, leaving surviving him three adult married sons and four adult married daughters. The will bequeathed to the testator's daughter, Helen Nicolas, the sum of $5,000. The balance of the entire estate, including his Hopland farm of 675 acres of land, except the bonds hereafter mentioned, was devised to his son Ernest, who was also named as sole executor to act without bond. He was also named as sole residuary legatee of all other property. The will declared that the other named children should inherit nothing for the reason that they had already received "from me more than their just proportion" of the estate. Ernest filed the will for probate in Mendocino County. The daughter Helen Nicolas, who was bequeathed the $5,000 legacy, filed a disclaimer of further interest, and did not participate in the contest of will. The remaining two sons and three daughters of the deceased

contested the will on three specified grounds: 1. Unsound mind, 2. Lack of due execution of the will, and 3. Undue influence. A nonsuit was granted as to the charge of lack of due execution of the will. Three interrogatories were submitted to the jury, namely: (1) Was the testator of unsound mind? (2) Was the will procured by the undue influence of Ernest Abert? (3) Was it the direct result of the fraud of Ernest Abert? The jury found that the will was the result of the undue influence of Ernest Abert. The other two issues were undetermined by the jury.

A motion for judgment notwithstanding the verdict was denied. A motion for new trial was also denied. The trial judge filed an able opinion, fully and fairly reviewing the evidence, and determined that the proponent sustained a confidential relationship toward the testator, and that the will was procured by the undue influence of Ernest Abert. The decree approved and adopted the verdict of the jury finding that the will was procured by the undue influence of Ernest Abert, and thereupon denied probate of the instrument. From that judgment the proponent, Ernest Abert, has appealed.

The only question on appeal is whether the verdict and judgment determining that the will was procured by the undue influence of Ernest Abert is adequately sustained by the evidence, under the circumstances of this case.

We are of the opinion there is substantial evidence to sustain the verdict and judgment denying probate of the will on the ground of undue influence. The evidence is conflicting. We shall not attempt to recite evidence favorable to the proponent. ▇ On appeal from a judgment in a will contest, like any other civil action, the evidence most favorable to the respondent should be accepted as true, and that which is unfavorable should be disregarded. (*Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384].) The trier of facts is the sole judge of the credibility of witnesses and of the weight of the evidence in a will contest just as he is in any other case. (*Estate of Teel, supra,* p. 526.) The circumstances proved in this case, together with the reasonable inferences to be drawn therefrom, adequately show that a confidential relationship existed between the proponent and his father at the time of the execution of the will; that the proponent was active in procuring the will; that the proponent dominated the volition of the testator, contrary to his desire, with respect to his disposition of his property; and that the proponent unduly profited by the terms of that instrument. The burden therefore shifted to the

proponent to show that the will was not the product of his undue influence.

The record contains evidence to show that the testator was a widower and 82 years of age at the time of the execution of the will. He was a native of France, who had lived in California 50 years or more, but spoke the English language imperfectly, although several close friends and some of his children, including the proponent, testified that he could read, understand and carry on a conversation in the English language. His wife died in 1924. He left surviving him three sons and four daughters, all of whom were married, and whose ages range from 37 to 51 years. They were all intelligent and fairly well educated. The testator was in normal good health and physical condition. He was industrious and frugal. Until shortly prior to the time he went to live with his youngest son, Ernest, who is the proponent of the will, he was solicitous of the welfare of all of his children, and often expressed his desire and intention to divide his estate equally among them. During that period he was on absolutely friendly terms with all his children. Most of his children and Edward Domergue, Mr. and Mrs. Locatelli, and Mrs. La Fon, old friends of many years' standing, so testified. There appears to be little doubt of that fact. Prior to 1915, he owned and operated a dairy ranch in Imperial Valley, where the entire family lived, and upon which the children worked without fixed compensation until they went with their parents to another ranch. In 1915, the Imperial Valley ranch was traded by the decedent for the Hopland ranch which is involved in this contest. They continued to live harmoniously with their parents and to assist in the operation of the last-mentioned ranch, until their marriages.

It appears that the 675-acre Hopland ranch, which contained timber land, grazing land, a vineyard and some sheep and cattle, was taken in the name of the daughter, Lucy Babcock, because of the existence of a judgment against the father. At the request of the father, the ranch was conveyed by Lucy to Ernest J. Abert, the proponent, March 16, 1933, and reconveyed to the father July 23, 1943. It was estimated that the ranch was valued at approximately $60,000, the farm machinery and equipment at $10,000, and the entire estate, independently of the bonds, was worth about $130,000.

The appellant married in 1929, but he and his wife continued to live on the Hopland ranch. In 1936, he bought an

automobile from the proceeds of the ranch, which he claimed was due to him for services performed for his father. In 1937, Ernest bought a ranch adjoining his father's Hopland land for $25,000, toward the purchase price of which his father contributed the sum of $12,500. Ernest and his wife then moved to their own farm. Soon thereafter the father went to live with his son Ernest, although he sometimes stayed in his own home. There is evidence that the father from this time became more and more dependent upon his son Ernest in the operation of his Hopland ranch and in various business transactions. The father could not drive an automobile. He relied upon Ernest to take him in the car wherever he wished to go. In 1944, when he was asked by his daughter, Lucy Babcock, of whom he was apparently very fond, why he never came to see her, he replied that he could only go where Ernest took him. In 1943 and 1944, he frequently told his children and friends that he wanted all of his children to share alike in his estate.

In March, 1927, three years after the death of his wife, Judge Held drew a will which was executed by the decedent, in which he devised and bequeathed his entire estate in equal one-seventh shares to his seven children. August 11, 1943, Charles Kasch, an attorney residing at Ukiah, drew a second will which was executed by the decedent, in which he devised and bequeathed his entire estate to his named children, except Ernest Abert, in designated percentages of value. The differences in the proportions devised are explained in the will by stating that the amounts which he had previously advanced to his children were deducted from their portions so that "all may share alike." With respect to Ernest, the will states that the testator had already advanced to him "in excess of his share of my estate," and that he therefore gave to him the sum of only $1.00. The son Fernand was made executor of the second will, to serve without bond. That will and other documents were left by the decedent in the possession of Mr. Kasch.

January 18, 1944, Ernest telephoned Attorney Charles Kasch, stating that his father was dissatisfied and wanted all his papers. That same month, while the testator was living with his son Ernest, they drove together to the office of Mr. Kasch in Ukiah to procure the will which he drew in August, 1943, dividing his estate equally among all his children, and other documents. They were met by appointment at Kasch's office by Fernand, who was present during the discussion which followed. Fernand testified that his father appeared to be

annoyed at his presence, that his father then asked him, "What are you doing here?" and then addressed him saying "You have done me enough trouble." When Fernand asked him what trouble he referred to, the testator replied, "I *understand* you stole everything that I have." The testator also said "I understand you have put everything in Charley Kasch's name." Fernand denied that he had taken anything belonging to his father, or that any property had been placed in Kasch's name. They then went together into the office of Charles Kasch and examined the documents in his possession. Fernand testified that after thoroughly examining and reading the documents Mr. Kasch asked his father "Are you satisfied?" to which he replied "Yes." The testator then turned to Ernest and asked him "Are you satisfied with the papers?" to which Ernest then replied "Yes, I am." They then went away, leaving the documents with Mr. Kasch. Soon thereafter, Mr. Kasch received a typewritten request signed by the testator, asking him to deliver all the papers to Judge Preston, which he promptly did.

After the second will and other documents which had been left in the possession of decedent's attorney, Mr. Kasch, had been delivered at the written request of the testator to Judge Preston, the decedent and his son, Ernest, went together to Judge Preston's office, and the latter drew a third will, on February 15, 1944, which was executed by the father, by the terms of which he gave to Ernest all of the property of his estate, including the Hopland ranch, with the exception of one $5,000 legacy, which he gave to his daughter Helen Nicolas. That will stated that the other named children were excluded from the will because each had been previously advanced more than his or her share of the estate. On the last-mentioned date the decedent also executed to his son Ernest a deed to the Hopland ranch, which was recorded a few days later. November 9, 1944, the decedent executed a five-year lease of the "Abert Ranch," together with the farming machinery, equipment and household goods to his son Ernest, in consideration for the payment of one-half of the gross income as rental. That lease was also recorded. November 9, 1944, for a stated consideration of $10, the decedent also executed to his son Ernest a bill of sale to all farm machinery and equipment of every description, together with all personal property, except money, "which I now have or which I may hereafter acquire." That personal property was esti-

mated to be worth $10,000. The bill of sale was likewise recorded. November 13, 1944, Judge Preston also drew the last will which is involved in this contest, which was duly executed by the testator, in which he devised and bequeathed all of his property, including the Hopland ranch, as previously stated, to his son Ernest, except a $5,000 legacy which was given to his daughter Helen Nicolas. All the other children were expressly excluded from the will for the stated reason they had previously received gifts in excess of the value of their just proportion. Ernest was made sole executor of the will to serve without bond.

Judge Preston died in May, 1947, prior to the trial of this case.

In November, 1943, and in January, 1944, about the time the second will and documents were withdrawn from possession of testator's attorney, Charles Kasch, the decedent, in company with the proponent, went to the bank and withdrew $43,-700, with which several government war bonds were purchased in the joint names of himself and four of his children, namely, Lucy Babcock for $11,500, Mary Aldrich for $5,000, Alice Pellisier for $11,500 and Fernand Abert for $11,700. That left cash on deposit in decedent's name in the sum of $13,400. Neither the proponent, Ernest, nor Helen Nicolas was given bonds at that time. But Helen was given a legacy of $5,000 in each of the last two wills, and the proponent had been previously given, in 1937, $12,500 in cash toward the purchase price of his home ranch which he then bought. Later he was given about $1,000 to purchase two lots and weighing scales. It also appears that both Helen and Ernest were given bonds at an earlier date during the first World War. On cross-examination, Ernest admitted that his father gave him bonds at one time of the value of $1,700, and at another time valued at $8,000, in the joint names of himself and father making a total sum of $9,700 in bonds, which more than offset the advances to the other children. At the time of the last-mentioned purchase of United States bonds, Helen Nicolas was also given war bonds in the sum of $5,000. Ernest said that he conducted that transaction for his father. He testified "I only made that transaction for him." It thus appears that the father attempted to equalize the gift of bonds to his children, independently of the devise and bequest of the will in question.

In that same month of January, 1944, Fernand visited his father at the home of Ernest where he was then living. Fer-

nand testified that his father did not recognize him at first. He said, "Well, he didn't know me at first." He said his father then "begged me to take him home to his own place." He said that his father was unhappy in Ernest's home, and wanted to go back to his own home to live. But Fernand urged him to remain where he was, telling him that "he could not live alone any more, that he was getting along in years."

On February 15, 1944, when Judge Preston drew the first will, which was executed on that date, Ernest accompanied his father, and was present during the preparation and execution of the will, as he was also present when Judge Preston drew the later will executed November 13, 1944, the deed to the Hopland ranch, and the lease and bill of sale of all farm machinery, equipment and household goods. Ernest explained his presence by saying he had to drive the machine and that, while his father "couldn't read or write very much, . . . I helped him out with it, . . . I explained things to him." It appears Ernest was also present with his father when he went to the bank to withdraw his money with which he purchased the bonds previously mentioned.

Prior to the execution of the last two wills, the deed to the Hopland ranch, bill of sale of farming implements, and other documents previously mentioned, while the deceased was returning on July 4, 1943, from a barbecue, in his automobile driven by his hired man, the car ran off the grade, as a result of which the decedent sustained an injury consisting of a concussion or at least severe shock. He was taken to a hospital at Ukiah for treatment, but he was soon removed to the home of his daughter Lucy Babcock in Redwood Valley, where he remained until about August 1st of that year. His daughter Mary Aldrich came from her home and assisted Lucy in taking care of their father. Fernand testified that after that accident his father "would imagine things," and that "He didn't recognize the house at various times. He didn't recognize some of his family." There is persuasive evidence that until after that accident and he had returned to the home of Ernest, he was congenial with all of his children and often expressed his intention of dividing his property equally among them.

The evidence indicates that Ernest kept close watch over his father's business and property affairs for at least a year or two before the last wills were drawn; that he advised and counseled his father regarding all his business transactions, and that a confidential relationship existed between them

during that period. The clear inference is that Ernest was active in procuring the large share of his father's estate, contrary to the testator's volition and desire. Considerable ill will existed between Ernest and his brothers and sisters who were excluded from the will. We conclude that the evidence amply shows confidential relationship, activity on the part of proponent at the very time of the execution of the last will, the securing of an undue proportion of the estate, and the execution of the will in question by the undue influence of the proponent.

The rule is firmly established in California that when the contestant has shown that the proponent of a will sustains a confidential relationship toward the testator, and actively participates in procuring the execution of the will, and unduly profits thereby, the burden then shifts to the proponent to prove that the will was not induced by his undue influence. (*Estate of Lances,* 216 Cal. 397, 403 [14 P.2d 768]; *Estate of Shay,* 196 Cal. 355, 363 [237 P. 1079]; *Estate of Gallo,* 61 Cal.App. 163, 175 [214 P. 496]; *Estate of Ehle,* 115 Cal.App. 656, 663 [2 P.2d 398]; *Estate of Easton,* 140 Cal.App. 367, 376 [35 P.2d 614]; *Estate of Trefren,* 86 Cal.App.2d 139, 147 [194 P.2d 574].)

The appellant in this case argues that before the burden shifts and the proponent is required to affirmatively prove that the will is not the product of undue influence, the contestants are required to prove, in addition to the foregoing, three elements mentioned, that the instrument is an *unnatural will.* In support of that contention he cites *Estate of Teel, supra,* at page 528, and *Estate of Yale,* 214 Cal. 115, 122 [4 P. 2d 153]. We think not. In the Teel case, in which the verdict and decree denying probate of a will on the ground of undue influence was affirmed on appeal, the Supreme Court merely said, at page 528, that where it appears, as it did in that case, that, "A fiduciary relationship exists between husband and wife in respect to the issue of undue influence in a will contest, and where such fiduciary relationship is combined with unduly profiting by the will, and its being unnatural, and activity on the part of the proponent in procuring its execution, *we have persuasive evidence of undue influence.*" (Italics added.)

We are persuaded the Supreme Court did not intend by the inclusion of the existence of an *unnatural will* in its recitation of facts in that case to hold that the foregoing rule, so frequently announced in our authorities, was thereby enlarged to

also require proof that the will is *unnatural* before the burden shifts so as to require the proponent to affirmatively prove that the will is not the product of his undue influence. All that the court said in the Teel case, in that respect, is that when proof of the four named elements appears there is *persuasive evidence of undue influence.*

Likewise, in the Yale case, *supra,* in which a nonsuit was granted in a contest to a will after it had been admitted to probate, on the ground of undue influence, among other stated grounds on appeal, the Supreme Court merely held that where the contestants adduced substantial evidence of confidential relationship, undue profit, activity of the proponent in procuring the will, physical and mental condition of the testator rendering him susceptible to such influence, and that the provisions of the will were unnatural, it was error for the trial court to grant a nonsuit on that ground since that issue should have been submitted to the jury for determination. The court further declared that evidence was sufficient to shift the burden to the proponent to show that the will was not the product of undue influence. That case does not change the previously-mentioned rule of evidence.

We are convinced there is ample evidence in this case to show a confidential relationship and undue profit secured by the proponent by the terms of the will. It also satisfactorily appears that the terms of the will, which gave to the proponent practically the whole of the estate valued at approximately $130,000, to the exclusion of five children for each of whom the testator always had a high regard and natural paternal affection was not in accord with his desire and intention, as expressed so frequently to his family and friends until a time shortly before the deed, bill of sale and will were executed in 1944, by often saying he intended his children to share equally in his estate.

In this case the presumption of the existence of undue influence appears to be applicable to the circumstances adduced so as to shift the burden to the proponent to show that the will was not the product of undue influence. The testator was aged and infirm. He was involved in an automobile accident shortly before the execution of the will in question. There is some evidence that the concussion or shock which he sustained affected his mind. He was always affectionate toward all of his children and frequently declared it was his intention to distribute his estate among them share and share alike.

Former wills so provided. He was living with the proponent and largely under his care at the time of the execution of the last will. In 2 Page on Wills, page 631, section 825, it is said, under similar circumstances, that:

". . . A presumption or inference of undue influence is said to arise where testator is aged and feeble, leaves the bulk of his property to the children with whom he lives to the exclusion of others for whom he has always manifested affection, or where testator actually reposes trust and confidence in the person with whom he lives."

The most serious question in this case is whether there is evidence, or reasonable inferences therefrom, that the proponent's activity was the procuring cause of the execution of the will contrary to the testator's volition and desire.

In the dissenting opinion of Mr. Justice Edmonds in the Teel case he correctly said: "It has been held that active participation in procuring the execution of a will cannot be inferred from the mere fact that the beneficiary accompanied the testator to the office where the will was drawn. [Citing authorities.]"

██ The issue of undue influence in procuring the execution of the will presents a question of fact for the determination of the jury under proper instructions. (2 Page on Wills § 661, p. 251.) ██ Circumstantial evidence, without any direct evidence, may be sufficient to support a finding of undue influence. (2 Page on Wills, *supra*; 26 Cal.Jur. § 76, p. 726.) It is said that where the proponent is the only person who can testify to the circumstances attending the execution of the will, his testimony is not binding on the contestant. (*Estate of Anderson*, 185 Cal. 700 [198 P. 407]; 26 Cal.Jur. § 76, p. 727.) ██ Among the facts which the authorities include as indicative of undue influence are: 1. Unnatural provisions of the will contrary to the expressed desire of the testator; 2. Disposition of the property contrary to the expressed intention of the testator; 3. A confidential relationship of the beneficiary of the will who thereby secures undue benefits, which relationship affords him the opportunity to exercise undue influence; 4. The age, infirmity, or circumstances which render him subject to coercion, influence or subversion of his free will or consent, and, 5. Wrongful activity in procuring the execution of the will. (26 Cal.Jur. § 19, p. 647.) Each of the foregoing elements is supported by California authorities. It is impossible to enumerate all the conditions, facts or circumstances which may be deemed to constitute

such activity, coupled with the other necessary elements which will render a will invalid on the ground of undue influence. The sufficiency of evidence showing activity or undue influence must necessarily depend upon the particular facts of each case. The contestant is entitled to the full force of the evidence adduced in support of his charge of undue influence, together with all reasonable inferences which may be drawn therefrom. Where there is substantial evidence to support the finding of undue influence, the verdict and the judgment rendered in accordance therewith should be affirmed on appeal. The trier of the fact is the sole judge of the credibility and weight of evidence in a will contest. (*Estate of Teel, supra,* at p. 526.)

We are convinced there is sufficient evidence in this case to adequately show that the proponent was active in procuring the execution of the will in question, that the burden shifted to the proponent to show that the will was not the product of his undue influence, and that he failed to support that burden.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied April 28, 1949, and appellant's petition for a hearing by the Supreme Court was denied May 26, 1949. Traynor, J., and Schauer, J., voted for a hearing.