[Civ. No. 7551. Third Dist. June 15, 1949.]

Estate of PATRICK H. LEONARD, Deceased. LEONARD J. MOORE, Contestant and Appellant, v. ELLEN BAG-WELL, as Executrix, etc., Proponent and Appellant.

Curtiss E. Wetter and Rawlins Coffman for Contestant and Appellant.

Stanley H. Pugh and William H. Stoffers for Proponent and Appellant.

PEEK, J.—By his last will and testament dated January 8, 1947, Patrick H. Leonard devised all of his estate, "both real and personal, and wheresoever situate, to my sister Ellen Bagwell and my said sister Margaret Danielson and to my brother-in-law, Herman Danielson, husband of said Margaret Danielson, share and share alike."

He died on September 26, 1947, and on September 30, 1947, the executrix therein named—the proponent in this proceeding —Ellen Bagwell, petitioned for probate of said will. Shortly thereafter Leonard J. Moore, decedent's nephew, filed a contest of the will on the grounds that at the time of the execution thereof decedent was not of sound and disposing mind, and was acting under the undue influence of Margaret Danielson, Ellen Bagwell and Herman Danielson. The contestant additionally alleged that the decedent had been declared mentally incompetent on May 19, 1947, by the Superior Court of Tehama County. It was further alleged that decedent had executed a previous will on August 31, 1943, by the terms of which he devised his entire estate to contestant and his wife Annabel, as joint tenants, and in the event that they should predecease him the property was left to their children, share and share alike.

Proponent's answer to the contest admitted that she and Margaret Danielson were appointed decedent's guardians on May 19, 1947, for the reason that said decedent was incompetent but denied that decedent was of unsound mind on the date of execution of the will, and further denied that the

will was the result of undue influence as alleged by contestant.

At the conclusion of contestant's case the trial court granted proponent's motion for nonsuit as to the issue of undue influence but denied a like motion upon the issue of the testator's mental capacity. The jury returned a verdict that the testator was not of sound mind at the time he executed the will on January 8, 1947, and judgment was entered denying the will probate. Both parties have appealed—the proponent from the judgment as entered on the sole ground that the evidence was insufficient to sustain the verdict and from the order denying her motion for judgment notwithstanding the verdict, while the contestant has appealed from the order granting proponent's motion for nonsuit on the issue of undue influence.

A summary of the evidence, which because of the questions raised by both proponent and contestant is necessarily lengthy, is as follows:

Decedent was 68 years of age at the date of his death and had never married. From 1925 until his retirement about one and one-half years prior to his death he concededly had enjoyed good health and had been employed continuously as a gardener and caretaker at an estate near McCloud, California. Following his retirement and until the fall of 1946 he made his home with contestant.

He was described by one witness as a fiery little Irishman possessed of a strong will, and by another as being jolly and good-natured and one who had many friends and few enemies. However, these witnesses further testified that subsequent to a nasal operation in the early part of 1945 a change occurred in decedent's mental and physical condition; he no longer was jolly; he could not carry on a coherent conversation, and he had become the victim of hallucinations.

The contestant and another witness who accompanied decedent on a trip to the coast in the latter part of 1945 testified that the decedent requested them to get his gun and shoot some coyotes which decedent claimed to see on the roof of a building adjoining the hotel where they stayed in San Francisco. There was further testimony by other witnesses concerning letters the decedent had written in which he referred to strange men digging up his flowers; of guards in the trees and of people swarming around them and of gold operations on his employer's estate.

Various witnesses who visited contestant's home during the period of decedent's stay testified that he was unable to converse intelligently or coherently. One witness testified to

a conversation in which decedent was worried concerning some women under the Chesterfield who were after him and kept peeking at him; that he next looked out of the window and professed to see some women riding horses in a near-by field, stating that "They have been running them hard all afternoon," and requested that the witness stop them from bothering the horses. The witness changed the subject and took the decedent for a ride in his automobile during the course of which he stated that he had been a chief of a tribe of Indians.

The contestant testified that since he was 10 years of age he and his uncle had been very intimate and that during the last 14 years of his life, which coincided with contestant's marriage, the decedent spent all of his vacations with contestant and his family. Further testimony of contestant revealed that decedent during his stay with them would tear the covers off his bed endeavoring to find a skunk which he imagined was there; that frequently he would arise at night and go to the bathroom but would not turn on any lights and would get lost in the house—that he would have to get up and get decedent back to his own bed; that he obtained a flashlight for him to use at night but that he lost it; that decedent had taken various canned foods from the kitchen, such as tuna, peaches, and asparagus; that he opened the cans and mixed the contents all together in a bucket in the barn and when this was discovered he stated that he was feeding his dog; that the testator had an identical twin who had a dog, an identical twin of a dog owned by decedent, both of whom followed him wherever he went; that the decedent was unable to care for his personal wants and that contestant and his wife had to treat him like a child; that he would not get a haircut or take a bath unless told to do so but that he would do whatever he was told; that he did nothing on his own initiative in regard to his business affairs, but with assistance would do as he was directed; that he would destroy his mail unless he was watched carefully, and that when he would receive checks in the mail he would endorse them only after contestant explained them to him—that contestant would then deposit them to decedent's account, and that anyone could get him to do anything they wanted if they handled him right.

The contestant further testified that on September 1, 1946, the decedent developed the idea that contestant and his family had turned against him. He related a conversation with decedent in which his uncle stated: "I know all about you. Maggie told me all about you . . . Maggie told me you were

going to throw me out of the place'' and ''Maggie told me you were afraid I was going to cut the kids' heads off and that I was going to do bodily harm to them.'' (We assume the reference to Maggie as meaning his sister, Margaret Danielson, one of the beneficiaries named in the will.) The witness testified that during such conversation the decedent appeared quite angry and that from that time on his uncle's attitude toward him changed completely. However, at a subsequent meeting decedent stated: ''I'm supposed to be mad at you but I'm really not.''

While returning from a visit to contestant's home during the 1945 Christmas holidays decedent, instead of changing trains as planned in Oakland, hired a taxicab and was driven to the home of his niece, Irma Benefield, in Mill Valley. She testified that when he arrived he was confused and dazed and could not tell her where he had come from or where he was going, necessitating that she telephone to contestant to obtain such information. The decedent remained overnight at his niece's home, and on the following day she took him to San Francisco and placed him on the proper train after placing a note in his pocket giving him directions as to where he was going and after wiring ahead to his destination to make arrangements for someone to meet the decedent there.

Contestant's wife testified to similar experiences, that decedent was afraid that people were after him, that when she would return home she would find all of the lights on and all of the window shades pulled down; that he followed her around wherever she went wanting to do whatever she did and gladly doing whatever she told him to do; that she treated him as she did her 7-year-old daughter; that she had to watch him while he took any medicine for the reason he might take the whole bottle instead of the prescribed dosage, and that he would write checks for any amount if he were not carefully watched. This witness also testified that the decedent cried when he told her that his sister had said he would have to live in her house because the contestant's family were going to be mean to him. During this same conversation he told the witness that Maggie had obtained a lawyer for him but he didn't know his name. Also she testified to a conversation with Mrs. Bagwell in the summer of 1946 during which Mrs. Bagwell told how sorry she was about Uncle Pat's condition; that she realized that he was difficult to care for; that she was too old and didn't want to be bothered with him, saying ''I don't want him at my house at all.'' She further testified

that same summer he stayed with the Danielsons while she was confined to a hospital undergoing an operation; that upon her return home they brought decedent back saying that he was going into their vineyard with big sticks trying to kill snakes and that Maggie was afraid of him and would keep him no longer.

On or about September 20, 1946, decedent was taken by contestant to the home of his father James E. Moore. Contestant testified he did so because he had planned to go on a hunting trip, and that decedent was in such a condition that he didn't want to leave him with his wife and children while he was absent. The contestant concluded his testimony with the statement that during the period in which the decedent resided with him he was, in his opinion, mentally unsound and that "anyone could take him and get him to do anything they wanted him to do if they handled him right."

James E. Moore testified that decedent stayed with him approximately three weeks during which time he slept on the sleeping porch; that decedent told him of men peeking through the screen at him, of seeing people dancing on the neighbor's lawn and of seeing contestant's daughter in a tree. Decedent left the home of James E. Moore on October 21, 1946 and went to the home of Margaret Danielson, his sister, and her husband Herman Danielson, where he resided until his death. James E. Moore further testified that when decedent went to the Danielson home he left some of his clothing behind, that after it had been returned by the laundry he notified decedent to come for it, that instead Mrs. Danielson came and demanded the clothes, and that when she was asked if decedent was in the car she replied that he could not talk to the decedent. The witness disregarded her statement and walked out to the car, that decedent shook hands with him and moved to get out of the car, but that Mr. Danielson, who was sitting beside decedent, grabbed him by the arm and said to the witness: "Pat Leonard is not going into your house." There was also testimony in this regard by contestant who stated that he went to see his uncle about a week after he had left the home of James E. Moore and was told by Mr. Danielson to get off the property, that he couldn't see him. After a heated dispute Mr. Danielson told his wife to bring Pat out. Contestant testified that "My aunt got him by the arm and brought him to the door and Herman got him on the other side by the arm and said, 'Here he is. Now talk

to him.' . . . So I just figured then that it was no use . . . so I turned around and left.''

Sometime in January, 1947, a friend of decedent's visited at the Danielson home. He testified that he attempted to talk with him but got no response at all and that Mrs. Danielson said, ''I don't think he understands what you are talking about.'' He further testified that when he took his departure the decedent went with him as far as the front gate and that he then invited him to see his new car, to which decedent replied, ''This is my bounds, right here. I can't go any further than this.''

Mrs. Danielson testified on direct examination that at no time did decedent leave her home unaccompanied by either herself or Mr. Danielson, or both of them.

In April, 1947, the decedent was discovered by a police officer wandering about the streets of Red Bluff in a semi-dressed condition. He was unable to state who or where he was. He was first taken to a hospital and then to the home of a friend where he told the persons there gathered that people had been chasing him through a big cave full of mud but that he heard his nephew whistle to him and he knew he was all right. The witness further testified that when the contestant arrived in response to a telephone call the decedent refused to shake hands with him, stating that he was supposed to be mad at his nephew. Decedent requested that he not be taken back to the Danielson home and expressed the desire to stay at the home of contestant's father.

The decedent's attending physician who was called as a witness by the proponent testified that in his opinion the decedent was of sound mind during the month of January, 1947, but of unsound mind from May until the date of his death in September, 1947. The proponent also produced other witnesses who were of the opinion that decedent was of sound mind during January, 1947.

The only evidence relative to the execution of the will of January 8, 1947, is the testimony of the attorney who prepared the same. He testified that he saw decedent several times subsequent to October, 1946, when he was served in the guardianship proceedings brought by contestant. The petition which sought the appointment of contestant as guardian of the decedent was opposed but the basis therefor does not appear in the record. However, it does appear that pursuant to an agreement the proceedings were dropped. The witness further testified that decedent was never alone when

he came to his law office but was always accompanied by his sister; that on one occasion he brought up the subject of making a new will, stating that "he had given Leonard everything he had and Leonard had thrown him out." The witness also testified that he and his secretary were the only ones present when the will was executed and that in his opinion the decedent was of sound mind at that time. The secretary, however, could recall nothing concerning the facts.

The proponent contends that the foregoing evidence does no more than show occasional delusions which occurred at times at least three months prior to and three months after the execution of the will, and cannot serve to establish incapacity at the time of execution. In other words, proponent's attack upon the judgment is based upon the sole ground of the insufficiency of the evidence to sustain the verdict of the jury.

Not every form of insanity nor every departure from the normal will destroy an otherwise valid testamentary act. (*Estate of Pessagno,* 58 Cal.App.2d 390 [136 P.2d 644].) Therefore the rule is not merely that no person who is insane may make a valid will, but rather is that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition of his estate shall be upheld. Thus, to set aside a will for insanity or mental derangement, the abnormalities of mind must have a direct bearing on the testamentary act, and the evidence must establish the fact that the property was devised in a manner which, except for the claimed infirmities, would not have occurred. (See *Estate of Llewellyn,* 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419]; *Estate of Selb,* 84 Cal.App.2d 46 [190 P.2d 277].) Testamentary incapacity because of unsoundness of mind is therefore of two classes: either insanity of such broad character as to establish mental incompetency generally, or a specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion which directly influenced the testamentary act. (See *Estate of Dupont,* 60 Cal.App.2d 276 [140 P.2d 866].) It necessarily follows that a testator has sufficient mental capacity to execute a will if he has sufficient capacity to understand the nature of his act, the extent and character of his property, and the persons who are the natural objects of his bounty. (*Estate of Russell,* 80 Cal. App.2d 711 [182 P.2d 318].) However, what persons other than the testator may think as to the justice or injustice of a will is simply a matter of opinion, and therefore, "before

the law will permit judges or juries to make disposition of a decedent's property irrespective of his or her desires, substantial evidence is required to show lack of testamentary capacity at the time of the execution of the will.'' (*Estate of Schwartz,* 67 Cal.App.2d 512 [155 P.2d 76].)

■ Applying the rules as enunciated to the evidence before us, resolving all conflicts therein in favor of the contestant, and indulging in all reasonable and legitimate inferences to uphold the verdict, if possible (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]), it is readily apparent that such evidence does no more than show, as proponent contends, that the deceased suffered occasional delusions and hallucinations during the latter years of his life. There is nothing to show, and therefore no substantial evidentiary basis for inferring, that the will was the product of such delusions or that the testator was not aware of the nature of his property and the natural objects of his bounty, and the judgments must therefore be reversed.

In determining the question raised by contestant's appeal, the propriety of the court's action in granting proponent's motion for a nonsuit upon the issue of undue influence, we are governed by the well established rule that a court should '' . . . grant such a motion when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.'' (*Estate of Green,* 25 Cal.2d 535, 546 [154 P.2d 692].)

■ The evidence presented to the jury shows that the testator executed the attacked will while he was living in the home of his sister Mrs. Danielson, and at a time when he was described as an obedient child who would do anything anyone ''wanted him to do if they handled him right.'' He had lived intermittently with contestant for many years, and by a prior will had made the nephew and his wife the sole beneficiaries of his estate, yet shortly after moving to the Danielsons' his whole attitude toward the contestant completely changed. He was restricted to the premises of the Danielson home and could not leave them unaccompanied. The Danielsons sought to prevent him from conversing with the contestant or his wife. The beneficiaries obtained a lawyer for the testator and always accompanied him to the lawyer's office.

The beneficiaries of the challenged will took the entire estate to the exclusion of the contestant who, with his wife, were the sole beneficiaries of the prior will which was executed at a time when the testator was admittedly of sound mental capacity and possessed of a fiery and independent personality. The record presents no explanation why the testator should have excluded the contestant, particularly when Mr. Danielson, a stranger to the blood, was included.

Such evidence establishes a confidential relation between the testator and the beneficiaries of the attacked will and that the mental and physical condition of the testator was such as to render him susceptible to undue influence. Viewing the foregoing evidence in the light of the rule that the mental and physical condition of the testator are factors to be considered on the issue of undue influence (26 Cal.Jur. 669-670), we find a testator who was like an obedient child, susceptible to suggestion, restricted to the premises of the beneficiaries of the attacked will which he never left unaccompanied by them, and who was prevented by them from conversing with the contestant and his wife. The jury could reasonably infer therefrom that the beneficiaries of the attacked will were active in procuring its execution. In addition, the will was unnatural in the sense that it included a stranger to the blood and excluded the testator's nephew who would have shared in the estate if the decedent had died intestate and who, with his wife, were the sole devisees of a prior will. ▮ Where a person sustains a confidential relation to the testator, is active in the preparation of a will and unduly profits by its terms, a presumption of undue influence arises casting the burden of showing that the will was not the product of undue influence upon the proponent of the will. (*Estate of Teel*, 25 Cal.2d 520 [154 P.2d 384]; *Estate of Hull*, 63 Cal.App.2d 135 [146 P.2d 242]; *Estate of Abert*, 91 Cal.App.2d 50 [204 P.2d 347].) Therefore since the record contains evidence, although contradicted, from which the jury could reasonably conclude that a confidential relation existed between the testator and beneficiaries, that the latter actively participated in the preparation of the will and that they unduly profited thereby, the issue of undue influence should have been submitted to the jury under the rule in *Estate of Green*, as above set forth.

For the foregoing reasons the judgment is reversed, the order of the trial court denying the motion for a directed

verdict is set aside, as is the order granting the motion for nonsuit, and the case is remanded for further proceeding in accordance with the views expressed herein.

Adams, P. J., and Thompson, J., concurred.

Petitions for rehearing were denied July 15, 1949, and petitions by both appellants for a hearing by the Supreme Court were denied August 11, 1949. Carter, J., and Schauer, J., voted for a hearing.