[Civ. No. 19173.   Second Dist., Div. One.   Feb. 17, 1953.]

Estate of TENNESSEE M. WASHINGTON, Deceased. ETHEL A. FINN, Appellant, v. JAMES ALEXANDER WASHINGTON, Respondent.

Bent & Clapp for Appellant.

Jerrell Babb for Respondent.

DRAPEAU, J.—This case involves a contest before probate of the last will of Tennessee M. Washington, deceased. Contestant is the son of testatrix' predeceased husband, Bishop William Washington. The proponent of the will, Ethel A. Finn, a niece of testatrix, is one of a number of devisees thereunder and is named executrix of the will. All the devisees or legatees named in the will are relatives of either testatrix or her deceased husband.

Grounds of the contest were: (1) Testamentary incapacity of testatrix; (2) Improper execution of the will; and (3) Undue influence of Ethel A. Finn.

The first trial resulted in a verdict for contestant. The trial court granted a motion for a new trial on the issue of undue influence. As result of this, the second trial, the jury brought in a special verdict that the will was procured by the undue influence of Ethel A. Finn. Accordingly, judgment denying probate of the will was entered, and a motion for new trial was denied.

This appeal followed.

It is here urged that there is no substantial evidence in the record to support the verdict and judgment. Also, that counsel for contestant was guilty of prejudicial misconduct.

Decedent's husband, William Washington, was a bishop and head of the Bethel Church of Christ of Los Angeles. He died on May 12, 1949. The widow was then 66 years of age, suffered from a heart ailment and was unable to attend the funeral. Proponent, Ethel A. Finn, had lived with her aunt and uncle as a young girl and when the bishop died was living with her family in the upper apartment of a duplex, owned by the Washingtons, who occupied the lower floor.

After her husband's death, Mrs. Washington was ailing and her niece helped to nurse her and assisted her in her business affairs.

Mrs. Finn's husband, Morris, had worked for the Santa Fe Railway as a mail clerk for 25 years. Shortly after the bishop's death, Mrs. Washington asked Morris if he thought the Santa Fe attorneys would ''handle'' her will. He said he would find out. Accordingly, he consulted Mr. William F. Brooks, an attorney for the Santa Fe, who agreed to prepare a will for Mrs. Washington. He gave Morris his business card to take to her. Neither of the Finns knew Mr. Brooks previously, although Morris had seen him around the office.

Thereafter Mr. Brooks had several telephone conversations with Mrs. Washington regarding her will, and various memoranda in sealed envelopes were delivered to him by Mr. Finn. Attorney Brooks met Mrs. Washington and Mrs. Finn for the first time when he took the will to the home for execution on June 7, 1949.

Mr. Finn testified that Mrs. Washington occasionally requested him to deliver papers in sealed envelopes to Mr. Brooks.

In answer to the question: "Now, you did discuss the making of the will with Mrs. Washington, didn't you, prior to the 7th of June, 1949?" Mrs. Finn stated: "I didn't discuss it. I took some notes down. She asked me to take some notes down for her. Mrs. Washington was pretty weak sometimes and she would get quite a few people to write things for her. She made up her own mind what she wanted done and asked me to take notes down for her, and she would read them back and she would correct them or make you rewrite them. If they weren't what she wanted, she would make you do them over again."

On June 7, 1949, the day the will was executed, Mr. Brooks was accompanied by his secretary, Mr. Pond. The latter testified that Mrs. Finn escorted them to Mrs. Washington's room, introduced them to Mrs. Washington and left. The testatrix was seated in a chair near a table. Mr. Brooks gave her a copy of the will and proceeded to read its contents to her. As he read descriptions of her properties, testatrix would stop him saying: "Just a minute, now," and inquire whether the particular description set up in the will had reference to the 2d Avenue, the 32d Avenue, the 41st Place or the Arizona property. Having read the document and discussed it with her, Mr. Brooks asked her if she wanted to sign it. The will was then executed, the two men signing as attesting witnesses. This took between 40 or 45 minutes. Mrs. Washington rang her bell and Mrs. Finn came into the room and escorted the two men from the house.

Mrs. Sill, a practical nurse previously employed by the testatrix, was visiting Mrs. Washington that morning. When the two gentlemen were announced, Mrs. Washington asked the witness "to leave the room because her attorney was there and she wanted to make a will." She testified that she saw the men when they came and when they left; that Mrs. Finn showed them in to Mrs. Washington's room and came out; that after about 45 minutes or an hour, she "heard Mrs. Washington ring her bell and Mrs. Finn came to her room and showed you out." During this period the witness "was in the next bedroom with Mrs. Finn waiting for them to leave."

The will here under review disposed of 20 acres of land in Arizona improved with a dwelling house, and three parcels of real estate in Los Angeles, to wit:

(1) The duplex on Second Avenue where the Washingtons and the Finns resided;

(2) The family homestead on 32d Street;

(3) A four-flat building on 41st Place.

The duplex was devised to the Finns and it developed at the trial that Mrs. Finn had loaned the Washingtons $6,000 when they purchased this property and held a note for that amount.

In October of 1949, Mrs. Washington sold the four-flat building to the Finns for $15,000. This was payable $5,000 in cash, and the rentals of $130 per month, which Mrs. Washington was then receiving, to apply on the balance. Mrs. Finn testified that she borrowed $7,100 from the Bank of America, out of which she gave Mrs. Washington $5,000 and used the balance to pay off a note on other property owned by the witness. The $5,000 was deposited to the credit of Mrs. Washington, who gave Mrs. Finn a check for $5,000 a day or two later. With regard to this, Mrs. Finn testified: "That was to enable me to pay the bank off because it was impossible for me to make payments of $92 a month to the bank and $130 to her, and that was so that she could receive the $130. That enabled her to continue with the same income she had. . . . That is the only way we could plan it out at all, and in this transaction we agreed that that would take care of the $6,000 that they owed me. . . ."

The 32d Street property was sold in December, 1949, for $8,000.

As a result, when Mrs. Washington died on December 27, 1949, there remained in the estate the duplex on Second Avenue which was left to the Finns, and the Arizona property, 10 acres of which were devised to James Wilson Washington, presumably the contestant; five acres to Mrs. Washington's nephew and five acres to the bishop's nephew.

Contestant presented evidence to the effect that he and his father, Bishop Washington, met for the first time in Nebraska in 1947. At that time, the bishop told him he would give him 10 acres of land he owned in Arizona if the witness would come west to live. James and his wife came to California and were very friendly with testatrix. After his father's death, James had a conversation with her and she told him: "I want you to have at my death your father's half of the estate. . . . You are his and I promised him that I would do the things that are right by you."

Reverend Gransberry Washington, a brother of the bishop, testified that he talked to testatrix in the period between May 23d and June 7, 1949; that she said she had thought of getting a lawyer, naming him, to make her will, but that "Ethel and Morris wanted me to use their lawyer. . . . Brother, there

are so many folks telling me things, I just don't know what to do. . . . I want my husband's people to have something. . . . I don't think Ethel and them want them to have anything.'' Also, she said she wanted ''James to have his father's estate.''

Reverend James Manley testified that he visited testatrix around May 23d and she told him she was worried about her business; that Mrs. Finn was worrying her about making a will and she did not know what to do about it; that she wanted to do the right thing, and wanted James to have his father's half.

Lonnie Smith, a nephew of Bishop Washington, testified that he lived with the Washingtons from 1922 to 1935. That after the bishop died, he visited Mrs. Washington almost every day; that prior to June 7, 1949, ''She asked me confidentially not to mention it, but she said that Ethel didn't want James to have half of my uncle's estate. . . . But she (testatrix) did not want her people to have everything my uncle accumulated, and it would be right for James to have half of his daddy's estate.''

Mrs. Hazel Washington, wife of contestant, testified that she was in the Washington home on June 7, 1949, the day the will was executed; that she saw Mr. Brooks and another gentleman come out of Mrs. Washington's room and that Mrs. Finn was following them; that she (the witness) then went into Mrs. Washington's room and found testatrix sitting in a chair; that Mrs. Washington ''thought I was Mrs. Finn. She looked up with a piece of paper in her hand and . . . she said, 'Ethel, what have you and your lawyers got me to sign?' She was quite nervous. . . . I just turned around after she said that. She not knowing me, I walked out.''

Mrs. Carolyn Bell Brown testified that she visited testatrix on July 15, 1949, and that the latter asked her if she knew a good lawyer. ''I asked her the reason why, because it kind of aroused my curiosity. She said that Mrs. Finn had had a will—had her to make a will, the contents of which she didn't know and hadn't seen, and . . . when she asked Mrs. Finn to let her see the will, Mrs. Finn told her, 'I have put it in your deposit box downtown. . . .' She said she didn't know the contents of the will, and she didn't know what was in it, and it was against her will, and as soon as she was able to get out she was going to look in her deposit box, and she was going to have a new will made herself.

''I says, 'I saw a copy of the will of yours in the news-

paper.' She said, 'You might have seen one, but it was Mrs. Finn's will and not mine.' She says, 'It was Ethel Finn's will, my niece.' "

In this state of the record, the jury brought in a verdict in favor of contestant and the trial judge denied proponent's motion for a new trial.

■ "On appeal from a judgment in a will contest, like any other civil action, the evidence most favorable to the respondent should be accepted as true, and that which is unfavorable should be disregarded. (*Estate of Teel,* 25 Cal. 2d 520, 527 [154 P.2d 384].) ■ The trier of facts is the sole judge of the credibility of witnesses and of the weight of the evidence in a will contest just as he is in any other case. (*Estate of Teel, supra,* p. 526.) . . . ■ The issue of undue influence in procuring the execution of the will presents a question of fact for the determination of the jury under proper instructions. (2 Page on Wills, § 661, p. 251.) ■ Circumstantial evidence, without any direct evidence, may be sufficient to support a finding of undue influence. (2 Page on Wills, *supra;* 26 Cal.Jur., § 76, p. 726.) " *Estate of Abert,* 91 Cal.App.2d 50, 52, 60 [204 P.2d 347].

■ And, as stated in 26 Cal.Jur., 651, section 21, citing *Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762]; *Estate of Sproston,* 4 Cal.2d 717 [52 P.2d 924]; *Estate of Arnold,* 16 Cal.2d 573 [107 P.2d 25]; *Estate of Hull,* 63 Cal.App.2d 135 [146 P.2d 242]; *Estate of Abert,* 91 Cal.App.2d 50 [204 P.2d 347]; *Estate of Leonard,* 92 Cal.App.2d 420 [207 P.2d 66], and *Estate of Merrick,* 93 Cal.App.2d 624 [209 P.2d 666]: "Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence, in the absence of testimony that there was pressure operated directly upon the testamentary act."

■ However, in 26 California Jurisprudence 653, section 23, citing many cases, among which are *Estate of Monks,* 48 Cal.App.2d 603 [120 P.2d 167]; *Estate of Wolleb,* 56 Cal. App.2d 488 [132 P.2d 864], and *Estate of Rabinowitz,* 58 Cal. App.2d 106 [135 P.2d 579], it is stated: "That the alleged wrongdoer had power or ability to control the testamentary act may be established by a variety of circumstances,—such as control over the decedent's business affairs, dependency of the decedent upon the beneficiary for care and attention, or domination on the part of the beneficiary and subserviency on the part of the deceased. Unless explained, a transfer of

property by the decedent to the alleged wrongdoer has a tendency to establish the charge of undue influence. Declarations of the decedent may be proved for the purpose of showing a subordination of the decedent to the will of the proponent. . . ."

In the old case of *In re McDevitt*, 95 Cal. 17, 33 [30 P. 101], the rule is stated as follows: "Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator."

Viewed in the light of the foregoing, there is sufficient evidence in the record produced by contestant to sustain the verdict of the jury and the judgment based thereon.

Appellant urges that counsel for contestant committed prejudicial misconduct in his cross-examination of Mrs. Sill at the instant trial. She had testified on direct examination regarding what occurred in the Washington home on the morning of June 7, 1949. This witness admitted having had a conversation with Mr. Babb, contestant's attorney, who then asked her: "Q. And you also stated to me, did you not, that you helped prepare Mrs. Washington to receive Mr. Brooks and his secretary, didn't you? A. I did not. Q. You also stated to me at that time, did you not, that Ethel Finn gave you a hypo needle and asked you to administer it to Mrs. Washington, didn't you? A. No."

Appellant's objection to these questions "as not proper cross-examination" was overruled.

In rebuttal, respondent's attorney offered a transcript of all of Mrs. Sill's testimony taken at the first trial. To this, appellant's attorney expressed himself as being "agreeable to anything with respect to Mrs. Sill's testimony. However, if it is to be admitted, I want the entire testimony read."

This transcript was read to the jury, including the following: "And do you remember that you told me that just before the attorneys came into the room that Ethel gave you a hypodermic needle, you being a registered nurse, for you to inject into Mrs. Washington's body? A. I did not, because I wasn't even on duty. I was not on duty that day and I do not give hypodermics, only under the doctor's instructions when I am hired."

Following this, Reverend Gransberry Washington took the stand and testified that he called on Mrs. Sill after Mrs. Washington's death in order to find out what transpired in the Washington home on the day the will was executed. In his conversation with Mrs. Sill he asked her about Mrs. Washington's condition that day, and she replied: "I don't know. 'I didn't wait no longer after the 7th.' She said, 'That was my last day with Mrs. Washington, and she was a very sick woman, and I gave her a hypo.' Q. On June the 7th? A. On June the 7th."

In the absence of objection to this line of questioning and a request that the jury be admonished to disregard it, the contention that it was prejudicial cannot be raised for the first time on appeal.

For the reasons stated, the judgment appealed from is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied March 9, 1953, and appellant's petition for a hearing by the Supreme Court was denied April 15, 1953.